IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ISMAIL SHAHATA, | ) | Civ. No. 09-00231 ACK-KSC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| W STEAK WAIKIKI, LLC, a Hawaii | ) | |
| limited liability company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

On May 21, 2009, Ismail Shahata ("Plaintiff" or "Shahata") filed a complaint against W Steak Waikiki, LLC ("Defendant" or "W Steak") alleging five claims: (1) Promissory Estoppel, (2) Infliction of Emotional Distress, (3) Invasion of Privacy, (4) Wrongful Discharge, and (5) Breach of Contract. Although originally represented by counsel, Plaintiff has proceeded pro se in this action since at least November 2009.[1]

On March 31, 2010, Defendant W Steak filed a motion for

---

[1] By way of a document titled "Attorney Substitution" dated October 27, 2009, and received by the Court on October 29, 2009, Plaintiff informed the Court that he had relieved his attorney, Mr. Geshell. On November 2, 2009, Mr. Geshell filed a Motion to Withdraw as Attorney for Plaintiff, which the Court granted on November 18, 2009. Magistrate Judge Kevin S.C. Chang found that Plaintiff discharged Mr. Geshell without fault in his Special Master Report Recommending that the Motion of R. Steven Geshell for an Award of Attorney's Fees, Costs and Lien for Representing Plaintiff be Granted in Part, and Denied in Part. Magistrate Judge Chang's Special Master Report was adopted by the undersigned on January 26, 2010.

summary judgment.  The Court held a hearing on Defendant's motion

for summary judgment on June 14, 2010.  On June 25, 2010, this

Court issued an Order Granting in Part, and Denying in Part,

Defendant's Motion for Summary Judgment ("6/25/10 Order").

Specifically, the Court granted summary judgment in favor of

Defendant with respect to Plaintiff's claims for infliction of

emotional distress, invasion of privacy, wrongful discharge, and

punitive damages.  <u>See</u> 6/25/10 Order at 41.  Plaintiff's claims

for breach of contract and promissory estoppel, however, remained

for trial because there were genuine issues of material fact

surrounding those claims.  <u>Id.</u>

A nine-day bench trial was commenced on August 24,

2010, and completed on September 3, 2010.[2/]  This court has

original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), and

venue is proper pursuant to 28 U.S.C. § 1391(a).  Having heard

---

[2/] After Plaintiff rested his case on August 31, 2010,
Defendant made an oral motion to dismiss pursuant to Fed. R. Civ.
P. 41.  8/31/10 Tr. 67:7-68-7.  This motion may also have been
made pursuant to Fed. R. Civ. P. 52(c), which states in relevant
part that:
> If a party has been fully heard on an issue during a
> nonjury trial and the court finds against the party on
> that issue, the court may enter judgment against the
> party on a claim or defense that, under the controlling
> law, can be maintained or defeated only with a
> favorable finding on that issue.  The court may,
> however, decline to render any judgment until the close
> of the evidence.

Fed. R. Civ. P. 52(c).  In either case, the Court heard argument
on the motion and then took the motion under advisement.  8/31/10
Tr. 68:9-81:21.  In view of the decision herein, Defendant's
motion to dismiss is moot.

and weighed all the evidence and testimony adduced at the trial, having observed the demeanor of the witnesses and evaluated their credibility and candor, having heard the arguments of counsel and considered the memoranda submitted, and pursuant to Fed. R. Civ. P. 52(a)(1), this Court makes the following findings of fact and conclusions of law. Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.

**FINDINGS OF FACT**

1.    This Court will begin by describing Defendant W Steak's background and corporate structure. The Court will then detail the events that gave rise to this litigation.

**I.    W Steak's Background**

2.    W Steak owns and operates Wolfgang's Steakhouse by Wolfgang Zwiener in Waikiki, which is located in the Royal Hawaiian Center in Waikiki ("W Steakhouse Waikiki"). 8/24/10 Tr. 73:5-74:15 (Kawamoto); 8/31/10 Tr. 103:11-20 (Cruz).[3/] W Steakhouse Waikiki is an upscale steakhouse that specializes in USDA prime dry-aged steaks and which strives to provide its patrons with a fine-dining experience. 8/31/10 Tr. 85:7-88:6 (Cruz). W Steak has two members, each of which holds a 50% interest in W Steak. W Steak's members are WDI International,

---

[3/] The record citations herein are to the rough draft of the transcript of proceedings because the final transcript is not yet available.

Inc., ("WDI") and W Steak Corporation ("W Steak Corp."). 8/24/10 Tr. 73:5-74:15 (Kawamoto).

3.    There are currently four (4) other restaurants known as Wolfgang's Steakhouse by Wolfgang Zwiener in the United States (collectively referred to as "W Steakhouse"), three (3) restaurants in New York, New York (Park Avenue, Tribeca, and Midtown) and one (1) in Beverly Hills, California. These four (4) restaurants are affiliated with W Steakhouse Waikiki but are not owned by W Steak. At the time Plaintiff was employed by W Steak, WDI and W Steak Corp. were members of W Steak Beverly Hills, LLC, which owns and operates Wolfgang's Steakhouse by Wolfgang Zwiener in Beverly Hills ("W Steakhouse Beverly Hills"). At that time, each member held a 50% interest in W Steak Beverly Hills, LLC. 8/24/10 Tr. 74:16-75:21 (Kawamoto). W Steak Corp. also owns and operates Wolfgang's Steakhouse Tribeca, Wolfgang's Steakhouse Park Avenue, and Wolfgang's Steakhouse Midtown (collectively referred to as "W Steakhouse New York"). 8/25/10 Tr. 108:5-12 (Ibrahim). W Steak, the Hawaii entity, holds no ownership interest in W Steakhouse Beverly Hills or W Steakhouse New York. 8/24/10 Tr. 74:16-75:21 (Kawamoto).

4.    The first W Steakhouse restaurant was opened in 2004 at the Park Avenue, New York location. 8/31/10 Tr. 83:16-84:9 (Cruz).

5.    A goal of the W Steakhouse restaurants is to

provide a patron dining in one location the same dining experience as if they were dining in any of the other locations. 8/31/10 Tr. 84:16-25 (Cruz).  Thus, each of the W Steakhouse restaurants contains the same concept, menu, and general appearance.  Id.; 8/24/10 Tr. 36:18-25 (Pacurucu); 8/25/10 Tr. 134:3-21 (Ibrahim); 8/27/10 Tr. 90:6-11 (Shahata admitted that he was told to copy everything from W Steakhouse Tribeca). Specifically, the concept of the restaurant is to serve its dry-aged steaks to patrons on a sizzling platter.  8/25/10 Tr. 2:17-24 (Kawamoto); id. 118:25-123:13 (Ibrahim); 8/31/10 Tr. 88:7-14 (Cruz).  In addition, although the prices for specific dishes may vary slightly between the various locations, the menu offerings are identical and the dishes are made according to the same recipes or provided by the same vendors.   8/25/10 Tr. 89:8-14, 134:23-135:23 (Ibrahim); 9/1/10 Tr. 85:3-10 (Cruz).[4/]  For example, the cheesecake served in the Waikiki location is shipped from New York so that all the locations serve the same cheesecake.  8/26/10 Tr. 23:4-13 (Ibrahim).  Further, each of the W Steakhouse restaurants contains the same plates, cups, flatware, and chairs.  8/25/10 Tr. 135:23-136:8 (Ibrahim).

_____

[4/] Donahue testified that eight new items have been added to the menu since W Steakhouse Waikiki was opened in February 2009. 9/2/10 Tr. 43:5-20 (Donahue); see also Def's Ex. 132 (menu for W Steakhouse Waikiki).  These changes, however, could have occurred in all W Steakhouse restaurants, and thus does not contradict Cruz's and Ibrahim's testimony.

6.   Amiro Cruz ("Cruz") is the Corporate Executive Chef for the W Steakhouse restaurants and oversees the kitchens at each of the five (5) locations.  8/31/10 Tr. 82:8-83:20 (Cruz).  Cruz is also a shareholder in W Steak Corp.  Id.  Cruz has been the Corporate Executive Chef for the W Steakhouse restaurants since the first restaurant opened in February 2004. Id.  Cruz is an experienced professional executive chef with many years of experience working in steakhouses.  Id. at 88:24-89:12. Prior to opening W Steakhouse, Cruz was the Executive Chef at Manhattan Grill for fifteen (15) years.  Id.  Prior to that, Cruz worked in various other kitchen positions at different restaurants.  Id.

7.   Amr Ibrahim ("Ibrahim") is the former General Manager of W Steakhouse Waikiki.  8/25/10 Tr. 62:19-20 (Ibrahim).[5/]  Ibrahim was the General Manager of W Steakhouse Waikiki from its opening in February 2009 until approximately January 2010.  Id. at 61:24-62:1.  Ibrahim was an experienced general manager with experience working in steakhouses.  Id. at 114:1-22.  Ibrahim has worked for the W Steakhouse restaurants since the first one opened in February 2004.  Id.  Ibrahim currently works at W Steakhouse Tribeca as the manager and floor captain.  Id. at 104:19-105:3.

8.   W Steakhouse Waikiki was opened by W Steak in

---

[5/] Amr Ibrahim is also sometimes referred to as "Amir".

February 2009.  On February 12, 2009, an opening was held at W Steakhouse Waikiki for VIP guests.  9/1/10 Tr. 16:25-17:5 (Cruz). On the night of February 13, 2009, the grand opening of W Steakhouse Waikiki to the general public took place.  Id.  W Steakhouse Waikiki had been in the planning and construction phases for approximately a year and a half prior to its opening in February 2009.  8/25/10 Tr. 112:15-113:5 (Ibrahim).

**II.     Plaintiff's Employment with W Steak**

9.   Plaintiff has worked in the restaurant industry since moving to the United States in 1984.  8/26/10 Tr. 162:10-174:4 (Shahata).  Plaintiff was working as a line cook, prep cook, and executive chef at various restaurants, including fine dining restaurants.  Id.; see also 8/27/10 Tr. 56:13-63:6 (Shahata).  Plaintiff's experience is primarily in Italian cuisine.  8/27/10 Tr. 56:13-63:6 (Shahata).

10.   Plaintiff and Ibrahim met in or around 1999 when Plaintiff was working as a cook at the Clam Castle, a restaurant owned by Ibrahim's cousin.  8/26/10 Tr. 110:16-111:1 (Shahata). Plaintiff worked at the Clam Castle as a cook for approximately one (1) year and then for a short period of one (1) to three (3) months as the executive chef before the restaurant closed. 8/25/10 Tr. 116:5-117:24 (Ibrahim); 8/27/10 Tr. 56:13-63:6 (Shahata).

11.   Ibrahim arrived in Hawaii on October 1, 2008, to

begin his work as general manager for W Steakhouse Waikiki. 8/25/10 Tr. 61:24-62:1; 112:10-113:17.  Until W Steakhouse Waikiki opened in February 2009, Ibrahim was involved in the planning and construction of the restaurant, which included visiting other steakhouses in the area to sample the quality of food at other restaurants.  Id.  In early January 2009, Ibrahim spoke to Plaintiff over the telephone about an Executive Chef/Kitchen Manager ("Executive Chef") position at W Steakhouse Waikiki.  At that time, the two candidates who had initially been offered the position, Gil "Patrick" Segarra ("Patrick") and Sergio "Fabian" Nigito, had declined the offer, therefore creating a need to fill the position.  8/24/10 Tr. 75:22-79:4 (Kawamoto); 8/25/10 Tr. 140:3-153:3 (Ibrahim); 8/31/10 Tr. 90:2-92:14 (Cruz).  Ibrahim previously had some discussion with Plaintiff regarding possible employment opportunities in Hawaii, but nothing concrete had been conveyed by Ibrahim to Plaintiff. 8/25/10 Tr. 92:18-93:25 (Ibrahim).[6]  Plaintiff testified that he was offered the Executive Chef position at least twice beginning in 2008, see 8/26/10 Tr. 175:18-180:12 (Shahata), but the Court does not credit this testimony because it was contradicted by

_____

    [6] Ibrahim testified that he spoke with Plaintiff about the Executive Chef position in July 2008, at which point in time Plaintiff indicated that he was interested in the position. 8/25/10 Tr. 149:13-151:9 (Ibrahim).  However, prior to offering Plaintiff the Executive Chef position, Ibrahim learned that another candidate (Fabian) had been offered the position.  Id.

several other more credible witnesses, see 8/24/10 Tr. 75:22-79:4 (Kawamoto); 8/25/10 Tr. 92:18-93:25, 140:3-153:3 (Ibrahim); 8/31/10 Tr. 90:2-92:14 (Cruz).[7]

     12.   On or around January 5, 2009, Ibrahim offered Plaintiff the position of Executive Chef over the telephone, which included a discussion of all of the terms outlined in the written Employment Offer discussed infra.  8/25/10 Tr. 94:1-17 (Ibrahim).  This included Ibrahim's indication to Plaintiff that Plaintiff would be committing himself to work at W Steakhouse Waikiki for one year.  Id.  Ibrahim noted that there would be a bonus, but he did not discuss a specific amount or formula that would be used to determine the bonus, as Ibrahim himself did not know those details at that point in time.  8/27/10 Tr. 22:9-13 (Ibrahim).  Plaintiff asked Ibrahim if there was any room for negotiation, to which Ibrahim responded there was not.  8/26/10 Tr. 113:18-19 (Shahata).  Plaintiff expressed interest and was told to contact Cruz.  Id.

     13.   Subsequently, Plaintiff contacted Cruz and met with Cruz at W Steakhouse Tribeca for approximately 30-45 minutes.  8/26/10 Tr. 114:22-25 (Shahata).  During that meeting,

---

[7] In his closing argument, Plaintiff asserted that he negotiated his employment offer as Executive Chef over the course of several months (which included conversations with Ibrahim, Cruz, and Peter Zwiener), 9/3/10 Tr. 3:7-10, but the Court does not credit this argument, especially since Plaintiff did not testify to this himself.

Cruz showed Plaintiff the various stations and asked Plaintiff if he was interested in the position, which he said he was.  8/31/10 Tr. 93:14-94:15 (Cruz).  Plaintiff was then told he would need to return for training.  Id. at 94:16-95:3.

14.  At the time Plaintiff decided to take the position with W Steakhouse Waikiki, Plaintiff had been working as a cook at Ford's Colony Country Club in Virginia since the end of November 2008.  8/25/10 Tr. 153:11-23 (Ibrahim); 8/26/10 Tr. 117:4-10 (Shahata); Def's Ex. 140.  In his position at Ford's Colony Country Club, Plaintiff earned $12.00 per hour.  Def's Ex. 140.  Plaintiff's total employment with Ford's Colony Country Club was for approximately seven (7) weeks during which he made a total of $3,058.80.  Id.

15.  Plaintiff represented to Ibrahim and Cruz that he had experience and knowledge as an executive chef.  8/25/10 Tr. 153:11-154:3 (Ibrahim); 8/31/10 Tr. 92:2-13 (Cruz).  Plaintiff was ultimately hired as Executive Chef for W Steakhouse Waikiki as the top management employee in the kitchen of that restaurant due to his representations regarding his experience, knowledge, and skills as an executive chef.  8/25/10 Tr. 153:11-154:3 (Ibrahim).

16.  Prior to commencing employment at W Steakhouse Waikiki, Ibrahim told Plaintiff on several occasions that no one, including himself, had job security with W Steakhouse Waikiki.

8/25/10 Tr. 138:3-7 (Ibrahim).[8/]  Plaintiff testified that

Defendant offered him a fixed-term contract, 8/31/10 Tr. 2:23-24

(Shahata), but the Court does not credit this testimony.

     17.  Prior to commencing employment at W Steakhouse

Waikiki, Plaintiff was trained by Patrick for approximately one

(1) week at W Steakhouse Tribeca.  8/26/10 Tr. 119:8-120:4

(Shahata).  The purpose of this training session was for

Plaintiff to learn the concept, recipes, and the way they do

things at the W Steakhouse restaurants.  8/31/10 Tr. 94:16-95:3

(Cruz).  During this training period, Cruz was at the W

Steakhouse Beverly Hills and therefore was not present when

Plaintiff received his training, so Plaintiff's training was

overseen by Patrick.  Id. at 95:13-96:4.  Cruz returned to New

York on Plaintiff's last night of training and arrived at the

restaurant after Plaintiff had already finished training for the

night.  Id. at 96:5-98:3.  Thus, Cruz was unable to observe

Plaintiff actually working in the kitchen.  Id.  When asked by

Cruz how things went and how he liked it, Plaintiff told him it

went very well and it was very easy.  Id.  Plaintiff never

indicated to Cruz that he did not have enough training or that he

---

[8/] Ibrahim was not certain whether he told Plaintiff that he
would not have job security during the conversation in which he
offered Plaintiff the position of Executive Chef, on or around
January 5, 2009, but he was certain that, prior to Plaintiff
arriving in Hawaii, he told Plaintiff on several occasions that
nobody had job security at W Steakhouse Waikiki.  8/25/10 Tr.
138:3-23 (Ibrahim).

did not know what his Executive Chef duties at W Steakhouse
Waikiki were going to be.  Id.  Plaintiff admitted that he
received adequate training during that week.  8/27/10 Tr. 92:10-
13 (Shahata).

Over the course of the training, Ibrahim, who was aware
that Cruz was in California for that time period, told Plaintiff
that he should stay longer in New York for training in order to
be able to work with Cruz.  8/25/10 Tr. 162:21-163:16 (Ibrahim);
8/31/10 Tr. 99:19-101:7 (Cruz).  Despite Ibrahim's suggestion,
Plaintiff did not stay longer because, according to Plaintiff's
testimony, he had to do his taxes and drive his wife around
(Ibrahim testified that Plaintiff said that he could not stay for
additional training because he had a court appearance; Cruz
testified that Plaintiff said he had other things to do in
Virginia and could not stay).  8/26/10 Tr. 96:1-5 (Shahata);
8/25/10 Tr. 163:7-9 (Ibrahim); 8/31/10 Tr. 100:4-7 (Cruz).

18.  Plaintiff flew to Hawaii on January 25, 2009, and
began employment with W Steak at W Steakhouse Waikiki on January
26, 2009, in the position of Executive Chef.  8/26/10 Tr. 101:18-
21 (Shahata).  W Steak paid for Plaintiff's plane ticket from
Virginia to Hawaii in January 2009 and paid for temporary housing
for one month (which ended up being the duration of Plaintiff's
employment with W Steak).  Id. at 99:21-101:17.  Moving expenses
for Plaintiff were never incurred because Plaintiff did not ship

12

any belongings to Hawaii other than what he brought with him on the plane during the time he was employed by W Steak.  <u>Id.</u>  In addition, the cost of plane tickets for Plaintiff's wife and one (1) child were never incurred because they were not scheduled to travel to Hawaii until after the school year ended in or around June, at the earliest.  <u>Id.</u>

19.  On Tuesday, January 27, 2009, Plaintiff was processed in as a new employee by Jeanne Kawamoto ("Kawamoto"), Director of Human Resources for WDI.  8/24/10 Tr. 81:23-82:1 (Kawamoto).  As part of this process, Plaintiff completed various forms[9] and was given an Employee Handbook, which Kawamoto saw Plaintiff read, and Plaintiff himself admits to having read.[10] <u>Id.</u> at 65:15-23, 81:23-82:17 (Kawamoto); 8/30/10 Tr. 70:2-10 (Shahata).[11]  In fact, during the next few days, Plaintiff made

---

[9] These forms included various employment forms such as Plaintiff's I-9 Employment Eligibility Verification and W-4 Withholding forms.  Although Kawamoto testified that Plaintiff completed and signed these documents on January 27, 2009, these documents were never submitted into evidence.

[10] Plaintiff at one point testified that he never read the Employee Handbook, 8/27/10 Tr. 205:19-23, but the Court does not find this testimony credible, especially since he later acknowledged that he read the Employee Handbook, 8/30/10 Tr. 70:2-10.

[11] Kawamoto also testified that Plaintiff signed a form acknowledging receipt of the Employee Handbook, but stated that this form had been misplaced.  8/24/10 Tr. 65:16-23 (Kawamoto). Plaintiff admits to having read the Employee Handbook, but asserts that he never signed an acknowledgment form.  8/30/10 Tr. 70:2-10 (Shahata).

several copies (approximately twenty five) of the Employee
Handbook to assist in the hiring process, and he handed out the
Employee Handbooks to potential new hires.  8/24/10 Tr. 81:1-6
(Kawamoto); 8/26/10 Tr. 124:6-11 (Shahata).  The Employee
Handbook, which was admitted into evidence as Defendant's Exhibit
133, was the same handbook that Plaintiff received as there have
been no revisions of the manual since it was implemented.
8/24/10 Tr. 81:13-22, 106:25-107:3 (Kawamoto).[12/]  The "Purpose of
this Handbook" section of the Employee Handbook specifies, in
pertinent part:

> This handbook is provided for your use as a
> reference and summary of personnel policies,
> standards of conduct, benefits, and procedures.
> It is for informational purposes and supersedes
> all other handbooks and informational pieces other
> than actual plan documents and official papers.
> This handbook sets forth the entire agreement
> between you and W Steak Waikiki, LLC. for the
> duration of your employment.  Nothing in this
> handbook, or any other personnel document, creates
> or is intended to create a promise or
> representation of continued employment for a
> specified period of time.  W Steak Waikiki LLC.
> maintains a policy of at-will as to the duration
> and the terms and conditions of the employment
> relationship.  This means W Steak Waikiki, LLC.
> reserves the right in its absolute discretion to
> change any term or condition relating to your
> employment and that you or W Steak Waikiki, LLC.

---

[12/] In his closing argument, Plaintiff asserted that he
received a different version of the Employee Handbook, 9/3/10 Tr.
5:16-23, but he never testified to this effect.  Even if he had
testified to this effect, the Court does not find Plaintiff's
position credible, as it was contradicted by Kawamoto's more
credible testimony and because Plaintiff has not come forward
with any evidence to support this position.

may terminate the employment relationship at-will,
with or without cause or prior notice.   No
employee, supervisor, manager or other
representative of the Company has the authority to
enter into any agreement for employment for any
specified period of time or any agreement
inconsistent with the at-will employment policy
unless such an agreement is in writing that
expressly states it is a contract on employment;
and is signed both by the Chief Executive Officer
of W Steak Waikiki, LLC. and you.   While this
handbook describes the polices and procedures the
Company may choose to follow with respect to
discipline, no formal disciplinary procedure,
warnings or progressive counseling is required
before W Steak Waikiki, LLC. may impose any form
of discipline, including termination.

Def's Ex. 133 at 5.

The "At-Will Employment" section of the Employee

Handbook provides:

W Steak Waikiki, LLC. personnel are employed on an
at-will basis.   Employment at-will may be
terminated with or without cause and with or
without notice at any time by the employee or the
Company.   Nothing in this handbook shall limit the
right to terminate at-will employment.   No
manager, supervisor, or employee of the Company
has any authority to enter into an agreement for
employment for any specified period of time or to
make an agreement for employment other than at-
will terms.   Only the President/or Chairman of W
Steak Waikiki, LLC. has the authority to make any
such agreement, which is binding only if it is in
writing.

Id. at 8.[13/]   Notably, however, during the time of Plaintiff's

---

[13/] When asked what "at will" means, Cruz testified that it
meant exactly what the Employee Handbook says it means; that
employment may be terminated with or without cause and with or
without notice at any time by the employee or the employer.
9/1/10 Tr. 79:15-83:25 (Cruz).

Employment with Defendant, W Steak Waikiki, LLC. did not have a President, Chairman, or Chief Executive Officer.  8/25/10 Tr. 34:16-20 (Kawamoto).[14/]

The "Standards of Conduct" section of the Employee Handbook states that "[v]iolations of these Standards of Conduct, and any other Company policy, procedure or rule, subjects you to disciplinary action up to and including termination."  Def's Ex. 133 at 44.  The Employee Handbook proceeds to note that "[u]nsatisfactory job performance" constitutes such a violation. Id. at 45.  Moreover, this section provides:

> Under the Company's at-will employment policy, the Company reserves the right to impose whatever form of discipline it chooses, or none at all, in a particular instance.  Disciplinary action may include oral or written warnings, suspension, demotion, and probation, ineligibility for a promotion or salary increase, and/or involuntary termination.  W Steak Waikiki, LLC. addresses violations on an individual basis.  Nothing in this Handbook should be construed as a promise of specific treatment in a given situation.  Although W Steak Waikiki, LLC. may choose to use progressive discipline under particular circumstances, no formal process of progressive discipline is required before W Steak Waikiki, LLC. may impose any form of discipline, including termination.

---

[14/] Ibrahim initially testified that Peter Zwiener was the President of W Steak, 8/25/10 Tr. 97:1-3 (Ibrahim), but later explained that he was referring to the corporate entity that owns the Tribeca and Park Avenue W Steakhouses (W Steak Corporation), id. at 108:13-110:9; 8/26/10 Tr. 61:20-62:9.  With regard to the Hawaii entity (W Steak Waikiki, LLC), he believed that Peter Zwiener was a member, but was unsure of this.  8/26/10 Tr. 61:20-62:9 (Ibrahim).

Id. at 44; see also id. at 64 ("The Company's policy of progressive discipline in no way limits or alters the at-will employment relationship.").[15/]

Kawamoto instructed Plaintiff that the Employee Handbook was to be his "Bible" and that he needed to be familiar with the Employee Handbook in order to manage his kitchen staff. 8/24/10 Tr. 82:5-13 (Kawamoto). Plaintiff was also informed that the Employee Handbook governed him as an employee as well. Id. at 82:24-83:1. At no time did Plaintiff ask Kawamoto or any other manager of W Steak any questions about anything contained in the Employee Handbook. Id. at 82:14-23. At no time did Plaintiff indicate to Kawamoto or any other manager of W Steak that he did not understand anything contained in the Employee Handbook. Id.

20. Subsequent to January 26, 2009, Plaintiff received and signed a document dated January 5, 2009, that was referred to as "Employment Offer and Contract Ismail Shahata" ("Employment

---

[15/] The Employee Handbook also states that "[t]he first 90 days of continuous employment at W Steak Waikiki, LLC. is considered an introductory period." Def. Ex. 133 at 15. It goes on to state that "[c]ompletion of the introductory period does not entitle you to remain employed by W Steak Waikiki, LLC. for any definite period of time, but rather allows both you and the Company to evaluate whether or not you are right for the position." Id. In her testimony, Kawamoto explained that the probationary period is a 90-day period in which W Steak uses to determine whether or not the employee can perform their job in a satisfactory manner, and that termination during this period is usually a result of poor attendance or unsatisfactory performance. 8/24/10 Tr. 109:8-110:6 (Kawamoto).

Offer"). The Employment Offer was not prepared until after Plaintiff's arrival in Hawaii, however. 8/24/10 Tr. 92:23-93:7 (Kawamoto). The Employment Offer was dated January 5, 2009, to reflect the approximate date Ibrahim offered Plaintiff the position as Executive Chef over the telephone. Id. (Kawamoto testified that Ibrahim and she "concluded that January 5th was an approximate date where Mr. Ibrahim had made the decision to offer [Plaintiff] the position"). Plaintiff admits that the first time he saw the Employment Offer was subsequent to January 26, 2009, after he had already arrived in Hawaii to work as the Executive Chef at W Steakhouse Waikiki. 8/26/10 Tr. 128:12-129:13 (Shahata). Although the dates next to the signatures on the Employment Offer reflect January 26, 2009, the Employment Offer was signed after this date, and the Employment Offer was backdated to January 26, 2009, in order to reflect the date Plaintiff began working for W Steak. 8/24/10 Tr. 93:11-94:15 (Kawamoto).[16]

_____

[16] Kawamoto testified that the Employment Offer was not signed on January 26, 2009, because she did not come into the office that day due to illness, and because she had not prepared the Employment Offer at that point in time. 8/24/10 Tr. 79:7-10 (Kawamoto); see also 8/26/10 Tr. 122:20-24 (Shahata confirming that Kawamoto was sick on Monday, January 26, 2009, and that he had not received the Employment Offer yet). Moreover, although Ibrahim at one point testified that the Employment Offer was signed on January 26, 2009, he later indicated that he was not certain of this. See 8/25/10 Tr. 57:16-17 (Ibrahim testifying that the Employment Offer was signed on January 26, 2009); id. at 174:9-19 (Ibrahim testifying that he was not certain which day
(continued...)

At one point, Kawamoto testified that the Employment Offer was prepared on either January 28 or 29, 2009.  8/24/10 Tr. 95:1-4 (Kawamoto).  She then testified that Plaintiff signed the Employment Offer on January 27, 2009, after he was processed in as a new employee and given the Employee Handbook.  8/25/10 Tr. 26:5-10 (Kawamoto).  She later clarified, however, that the Employment Offer was prepared on January 27, 2009, and signed later in that week.  Id. 39:7-40:3 (Kawamoto stated that she prepared the Employment Offer after Plaintiff was processed in as a new employee on January 27, 2009, and that it was signed by Plaintiff and Ibrahim later in that week).  Plaintiff testified that the Employment Offer was signed on February 4, 2009.  8/26/10 Tr. 128:12-129:13 (Shahata); Pl's Ex. 2.[17]  In any of

---

[16]/(...continued)
the Employment Offer was signed).

[17]/ Plaintiff submitted into evidence a fax copy of the Employment Offer which indicates that it was faxed from WDI's administrative office on February 4, 2009, which was not signed by Plaintiff at that point in time (although Ibrahim's signature was present).  Pl's Ex. 2.  Plaintiff submits that on February 4, 2009, Ibrahim signed the document and Plaintiff proceeded to fax the document to his wife in Virginia, signing the Employment Offer himself shortly thereafter.  8/27/10 Tr. 122:1-124:17 (Shahata).  This position, however, directly contradicts Plaintiff's prior declarations and deposition testimony wherein Plaintiff stated that he signed the Employment Offer on January 26, 2009.  See Def's Exs. 141 (Plaintiff's Separate Concise Statement of Facts stated "The second day [either January 26 or 27, 2009] I went to the restaurant, I was surprised that it was still in its final construction stage.  I was presented with the employment contract, and I signed the contract as an executive chef."); see also Def's Ex. 142 (Plaintiff's Supplemental Trial
(continued...)

these scenarios, however, the evidence shows that the Employment Offer was signed by Plaintiff after Plaintiff received and read the Employee Handbook on January 27, 2009.

21.   The Employment Offer provided: "W Steak Waikiki, LLC would like to formally offer you the position of Executive Chef.  This position will be located at our Honolulu restaurant." Def's Ex. 101.  The Employment Offer further sets forth:

> You will receive an annual base salary of $60,000, plus a full benefit package consisting of free medical, dental, vision insurance for yourself and eligible dependents (effective 30 days after your start date).  In addition, you will be eligible for two (2) weeks of paid vacation.  You will also be eligible to receive a quarterly bonus paid out in the month following the end of each quarter.  Terms and conditions of the bonus will be discussed and agreed upon at a later date.
>
> In order to accommodate your moving expenses, we are offering to pay the costs of you and your wife and one (1) child's airfare from Virginia to Honolulu and one (1) month of temporary housing expenses.  The company will also reimburse you for reasonable moving expenses incurred, not to exceed $5,000.  Your employment will begin approximately four (4) weeks prior to the store opening, the exact date will be determined.  Once you begin

---

[17]/(...continued)
Brief stating the same); 8/30/10 Tr. 26:7-18 (Shahata acknowledged that his previous deposition testimony contradicted his assertion that he signed the Employment Offer on February 4, 2009).  Moreover, this evidence is not necessarily persuasive because Plaintiff could have made a copy of the Employment Offer on January 27 or 28, 2009, prior to signing it, and then faxed the copy to his wife on a later date, after the Employment Offer was actually signed by Plaintiff.  In any event, as noted _infra_, Plaintiff's position that the Employment Offer was signed on February 4, 2009, reaffirms the fact that Plaintiff received and read the Employee Handbook prior to signing the Employment Offer.

> working, you will begin receiving pay and
> benefits.
>         Upon signature of this document, you Ismail
> Shahata will be agreeing to a one (1) year
> commitment to W Steak Waikiki, LLC and to the
> Honolulu location.  For the purpose of this
> contract, the one (1) year will begin once the
> restaurant is officially open and in full
> operation and will end in twelve (12) complete
> months.  Once you have completed one (1) year,
> your contract can be reviewed and extended if both
> the Company and employee agree.[18]  At that time, a
> new contract will be written outlining any new and
> remaining terms.

Id.  At the time the Employment Offer was signed, the terms of

the bonus had not been discussed nor agreed upon by W Steak and

Plaintiff.  8/27/10 Tr. 7:13-20 (Ibrahim); 8/24/10 Tr. 98:11-21

(Kawamoto).  Plaintiff testified that Ibrahim told him he would

receive $8,000-$10,000 per quarter as a bonus, 8/26/10 Tr.

113:21-22 (Shahata), but the Court does not credit this testimony

as it was contradicted by both Ibrahim's and Kawamoto's more

credible testimony, see 8/27/10 Tr. 22:9-13 (Ibrahim testified

that he "absolutely did not" tell Plaintiff that he would make

around $10,000 per quarter as a bonus).  For instance, even

though Ibrahim's employment offer contained the same provision,

Ibrahim testified that he did not know how the bonus would be

computed at that point in time.  Id. at 7:13-20.  Moreover, the

---

[18] Kawamoto testified that the provision which read "[o]nce you have completed one (1) year, your contract can be reviewed and extended if both the Company and employee agree," related, inter alia, to whether Plaintiff's salary would be increased or decreased after one year.  8/24/10 Tr. 101:24-102:22 (Kawamoto).

evidence showed that W Steak did not start providing its management employees with bonuses until August 2009 (which were monthly instead of quarterly), and the bonus for the executive chef was significantly less than $10,000 per quarter.  Def's Ex. 145; 9/1/10 Tr. 146:21-154:9 (Kawamoto).  Further, the Court notes that Kawamoto testified that there was no profit in the quarter in which Plaintiff worked, and that the bonuses were tied to the restaurant's profit.  8/25/10 Tr. 67:2-17 (Kawamoto); 9/1/10 Tr. 146:21-154:9 (Kawamoto).

22.  As noted, the Employment Offer provided "[u]pon signature of this document, you Ismail Shahata will be agreeing to a one (1) year commitment to W Steak Waikiki, LLC and to the Honolulu location."  Def's Ex. 101.  Kawamoto testified that due to the significant monies W Steak was expending on moving Plaintiff and members of his family to Hawaii, it was W Steak's intention that this provision regarding a one (1) year commitment only applied to Plaintiff.  8/24/10 Tr. 100:11-101:12 (Kawamoto).  In other words, although this provision is contrary to the Employee Handbook and the nature of at will employment, the inclusion of this language related more to Plaintiff's moving expenses and transportation costs, rather than his actual employment.[19]  It was never W Steak's intention for this language

---

[19]  As discussed _infra_, an employee may be employed on an at-will basis, and also have a separate one-year agreement related
(continued...)

to mean that Plaintiff's employment was for a specified period of time. Id. at 101:13-23. The Employment Offer was signed by Ibrahim as the General Manager of W Steakhouse Waikiki. Def's Ex. 101. Ibrahim also signed the Employment Offer on Peter Zwiener's behalf, who was a member of W Steak Waikiki, LLC. Id.

23. Plaintiff's Employment Offer contained the same language that was contained in Ibrahim's employment offer, with the exception of the salary and moving expenses amount. 8/25/10 Tr. 65:7-66:4 (Ibrahim). With respect to the language pertaining to the one (1) year commitment, Ibrahim was aware that he was committing himself to working at the Waikiki location for one (1) year. Id. Ibrahim did not believe that W Steak was committing not to terminate him for a period of one (1) year. Id.

Moreover, Ibrahim noted that he was bound by the Employee Handbook. Id. at 66:9-20, 138:3-7. In addition, as noted supra, Ibrahim told Plaintiff that he had no job security, and Plaintiff's Employment Offer contained the same language that was contained in Ibrahim's employment offer. Id.

24. As Executive Chef for W Steakhouse Waikiki, Plaintiff was to manage and control the kitchen, performing a

---

[19]/(...continued)
to relocation expenses. See Shen v. Biogen Idec Inc., 523 F. Supp. 2d 48, 51-52 (D. Mass. 2007) (noting that the employee was employed on an at will basis, but also that she was subject to a relocation agreement which stated that if the employer terminated her for cause or poor performance within a year, the employee would be required to repay the employer for her moving expenses).

leadership role in the kitchen.  8/31/10 Tr. 128:25-130:13

(Cruz).  As Executive Chef, Plaintiff was to be the person in

charge of the kitchen.  Id.  In terms of the actual kitchen

operations, Plaintiff was expected to ensure that quality

culinary dishes were served on schedule to patrons and to rectify

any problems that might arise in the kitchen.  Id.  As such,

Plaintiff was responsible for approving all prepared food items

that left his kitchen.  Id.  To do this, Plaintiff was required

to manage the food preparation and cooking to ensure that food

quality standards were met.  Id.; 8/25/10 Tr. 190:25-191:15

(Ibrahim).  Further, Plaintiff was charged with ensuring that

sanitation and safety laws were complied with.  8/31/10 Tr.

137:18-138:8 (Cruz); 9/2/10 Tr. 39:4-6 (Donahue).  As Executive

Chef, Plaintiff was also expected to handle "expediting" of the

meals, which entails ensuring that meals leaving the kitchen are

consistent in quality, presentation, and that the courses for

particular tables were served simultaneously.  8/31/10 Tr. 126:5-

127:15 (Cruz).  The expediting station is the last stop before

the food is taken out by the servers and requires reading the

tickets that come out of a machine, garnishing/cleaning the

plates and calling out to the line cooks for any missing meals

for a particular ticket.  Id. at 115:13-126:4 (Cruz); 9/2/10 Tr.

38:5-23 (Donahue).  The expediting station does not require any

computer skills and does not require the input of any

information.  8/31/10 Tr. 115:13-126:4 (Cruz).  Because this

station is so critical, absent unusual circumstances, a

management level employee is expected to handle expediting.  Id.

In other words, although other employees may serve as an

expediter at times, the Executive Chef is in charge of ensuring

that it is done properly, and it is often necessary for the

Executive Chef to perform the expediting function himself.  Id.

at 126:23-25; 9/1/10 Tr. 35:21-24 (Cruz).  The current Executive

Chef, James Donahue ("Donahue"), testified that thirty percent

(30%) of his job is devoted to the expediting function.  9/2/10

Tr. 31:15-22 (Donahue).

In addition, the Executive Chef had certain

administrative duties, which included hiring, training,

scheduling, and supervising/managing of the personnel who worked

in the kitchen.  8/31/10 Tr. 131:10-14 (Cruz).[20]

25.  Plaintiff, as Executive Chef, reported to, and was

directly supervised by, Ibrahim.  8/25/10 Tr. 111:6-12 (Ibrahim).

Plaintiff was the top management employee in the kitchen, with

all kitchen staff, including line cooks, prep cooks, and

dishwashers reporting to him.  Id. at 67:21-68:2, 111:19-23.

During the time Plaintiff was employed by W Steak, he was also

---

[20] Cruz testified that no kitchen employees had been hired
before he came to Hawaii, and that the hiring decision was a
joint decision made by Plaintiff, himself, and other critical
restaurant personnel.  8/31/10 Tr. 135:18-137:17 (Cruz).

supervised by Cruz, who was present at W Steakhouse Waikiki to

oversee its opening.  8/27/10 Tr. 16:3-17:4 (Ibrahim); 9/1/10 Tr.

73:6-74:9 (Cruz).[21/]

      26.  At W Steakhouse Waikiki, certain standards for

food preparation and quality, portions sizes, recipes and menu

were set by Cruz in order to ensure a consistent restaurant

experience across the W Steakhouse restaurants.  8/31/10 Tr.

141:1-18 (Cruz).  On several occasions, Plaintiff was directed by

Cruz and Ibrahim that these standards were to be adhered to

without question.  Id.  The kitchens at each of the W Steakhouse

restaurants, including the Waikiki location, contained an

identical book with the recipes for the dishes that were made on

site ("Recipe Book").  Id. at 130:14-23.  Notwithstanding the

existence of the Recipe Book, Cruz observed Plaintiff attempting

to make key lime pie by simply scooping an unmeasured amount of

flour with his hand into the mixture.  Id. at 142:15-144:19.

Cruz stopped Plaintiff, and told him he needed to follow the

recipe and start over.  Id.  On another occasion, prior to

commencement of the dinner service, Ibrahim was in the kitchen

_____

[21/] Ibrahim testified that at a management meeting held on
February 20, 2009, he told Plaintiff that it was "Amiro's
kitchen."  8/27/10 Tr. 15:18-16:8 (Ibrahim).  However, Ibrahim
testified that this statement simply referred to the fact that
Cruz designed the menu and was responsible for supervising all
kitchen employees at every other W Steakhouse, and that it did
not mean that Plaintiff was not responsible for his Executive
Chef duties.  Id.

and saw crème brûlée in the refrigerator that had a grayish color, which should have been yellow.  8/25/10 Tr. 192:19-194:3 (Ibrahim).  When he asked someone in the kitchen who had prepared the crème brûlée, he was informed that Plaintiff had made the crème brûlée.  Id.  Ibrahim instructed Plaintiff that the crème brûlée did not look right and needed to be discarded and made again.  Id.  Ibrahim instructed Plaintiff to wait until Cruz arrived so that Cruz could work with Plaintiff to properly prepare the crème brûlée.  Id.  Cruz also testified to this, and was particularly concerned about the grayish colored crème brûlée because the fact that it was in the refrigerator chilling meant that Plaintiff intended to serve it to patrons.  8/31/10 Tr. 146:3-22 (Cruz).

27.  Due to the opening of W Steakhouse Waikiki in February 2009, Wolfgang Zwiener, Peter Zwiener, Cruz, and other critical restaurant personnel from the mainland W Steakhouse restaurants were present in Hawaii to assist with and oversee the opening of W Steakhouse Waikiki.  9/1/10 Tr. 15:16-16:24 (Cruz).

28.  As Corporate Executive Chef for the W Steakhouse restaurants, it was Cruz's responsibility to stay in Hawaii and oversee things until he saw that operations were running smoothly.  8/31/10 Tr. 101:11-102:2 (Cruz).  Although Cruz's family came to visit him for approximately one (1) week when he was in Hawaii for the opening of W Steakhouse Waikiki, Cruz

wanted Plaintiff to succeed as Executive Chef so that he could return to his family in New York.  Id. at 102:3-18; 9/1/10 Tr. 37:6-17 (Cruz).[22]

29.  Prior to the grand opening of W Steakhouse Waikiki, various members of W Steak, as well as personnel from WDI and other W Steakhouse restaurants became concerned regarding Plaintiff's ability to perform as the Executive Chef.  In particular, Plaintiff did not satisfactorily perform administrative duties during the hiring process.  For example, Plaintiff could not differentiate between an applicant and an individual that had been hired ("new hire") despite instruction by Kawamoto on this issue.  8/24/10 Tr. 86:4-91:3 (Kawamoto).  As a result, individuals who had not filled out an employment application and who had not been interviewed in the hiring process were processed as new employees.  Id.  Although Plaintiff was instructed several times by Kawamoto that the individuals needed to complete applications and go through the hiring process

---

[22] When asked what reason W Steak might have to terminate Plaintiff without cause, the only reason Plaintiff could come forward with was the desire to save money.  8/29/10 Tr. 192:21-193:3 (Shahata).  This explanation is not plausible, however, and is not supported by any evidence.  To the contrary, the evidence showed that Cruz wanted Plaintiff to succeed as the Executive Chef because it was Cruz's responsibility to ensure that W Steakhouse Waikiki had a successful opening, which included having an Executive Chef that could perform his job adequately. 9/1/10 Tr. 37:21-38:7 (Cruz).  Cruz also wanted Plaintiff to succeed so that he could return to his family in New York. 8/31/10 Tr. 102:3-18 (Cruz).

before they were given new hire packets, Plaintiff continued to

give new hire packets to everyone that walked through the doors

of the administrative office.   Id.

30.   On February 12, 2009, the night of the VIP opening

of W Steakhouse Waikiki, and on another occasion, Kawamoto

observed that Plaintiff did not know how to properly handle

workplace injury situations.[23]   8/24/10 Tr. 116:7-121:2

(Kawamoto).[24]   Kawamoto testified that, on the second occasion,

rather than taking responsibility and addressing it himself,

Plaintiff had a manager from the front of the house report the

workplace injury.   8/24/10 Tr. 118:10-119:18 (Kawamoto).

31.   On the night of W Steakhouse Waikiki's grand

opening (February 13, 2009) and in the days immediately following

the opening, Ibrahim, Cruz, representatives of the members of W

Steak, and kitchen staff observed that Plaintiff was unable to

satisfactorily perform as the Executive Chef.   8/26/10 Tr. 6:5-19

---

[23]   Ibrahim testified that nobody was injured "when the
priest was blessing [the restaurant]," 8/25/10 Tr. 102:3-4, but
did not indicate whether anyone was injured before or after the
blessing.

[24]   Referring to the VIP party that took place on February
12, 2009, Plaintiff testified that an injury occurred "before the
grand opening," wherein an employee injured himself on the slicer
machine.   8/26/10 Tr. 135:23-136:2; 8/27/10 Tr. 164:3-8
(Shahata).   He asserted, however, that he was unable to assist
the injured employee because he was preparing hollandaise sauce,
which must be continually attended to.   Id. at 136:10-16.   This
explanation is not plausible, however, because hollandaise sauce
was not served during the VIP party on February 12, 2009.
8/31/10 Tr. 139:3-18 (Cruz).

(Ibrahim); 9/1/10 Tr. 23:1-25:20 (Cruz).  In particular, Plaintiff did not ensure that the food prepared and served met W Steakhouse standards.  9/1/10 Tr. 3:3-23 (Cruz).  In addition, Plaintiff did not properly control/manage the kitchen by taking charge and leadership of the kitchen.  Id. at 23:1-25:20.  Cruz testified, and Plaintiff admitted, that Plaintiff often had a blank look on his face and did not look like he wanted to take responsibility for anything.  9/1/10 Tr. 41:6-21 (Cruz); 8/31/10 Tr. 21:19-22:10 (Shahata).  As Cruz testified, Plaintiff would commit to Cruz that he would do certain things and then not follow through, and then would not take responsibility, making excuses for his lack of follow through.  9/1/10 Tr. 41:6-21 (Cruz).  Plaintiff also had difficulty with the training of kitchen staff.  Id.  Further, Plaintiff became overwhelmed during a peak service time.  Plaintiff, whose responsibility was to manage the kitchen and expedite the food, reverted to working as a line cook during critical times, rather than perform management functions such as coordinating and expediting meals to be served to patrons.  8/25/10 Tr. 196:12-20 (Ibrahim); 9/2/10 Tr. 28:17-24 (Donahue).

    32.  For example, Cruz observed that Plaintiff had difficulty cutting the steak according to the W Steakhouse standard.  9/1/10 Tr. 3:3-23 (Cruz).  Plaintiff was unable to slice and put the steak back together in the manner in which W

Steakhouse wanted their steaks to be presented.   Id.

33.   In terms of training other kitchen personnel, there were several occasions where Plaintiff would show then sous chef JP Choy ("Choy") how to do certain tasks such as cutting fish and broiling meat.  8/27/10 Tr. 160:14-162:7 (Shahata).  However, when Choy would ask Patrick how to do the same task, Patrick would tell Choy something quite different.  Id.; 8/24/10 Tr. 52:23-56:15 (Choy).  When Choy inquired of Cruz how he should perform the task, Cruz stated, in each instance, that the way Patrick showed him was the correct way to perform the task.  8/24/10 Tr. 52:23-56:15 (Choy).[25/]

34.   Plaintiff was also observed incorrectly preparing the ahi portions of the ahi tartare causing Cruz to become upset with Plaintiff.  9/2/10 Tr. 21:20-22:17 (Donahue).

35.   Cruz testified, and Plaintiff admitted, that Plaintiff talked too much about changing things rather than following W Steakhouse recipes and systems.  9/1/10 Tr. 40:23-41:5 (Cruz); 8/31/10 Tr. 21:19-22:10 (Shahata).

36.   Based upon Plaintiff's inability or unwillingness to prepare the food products according to W Steakhouse standards, Shahata was unable to appropriately train kitchen personnel.   See

---

[25/] At trial, Plaintiff seemed to suggest that Choy was hired to replace him, but this was not supported by the testimony at trial, which clearly indicated that Choy was hired as the number two chef to assist Plaintiff.  See 8/24/10 Tr. 113:18-24 (Kawamoto); id. at 58:10-12 (Choy).

8/24/10 Tr. 52:23-56:15 (Choy).

   37.   In terms of his attire, on a repeated basis
Plaintiff did not dress professionally or in a manner expected of
an Executive Chef.  9/1/10 Tr. 13:11-13 (Cruz).  Specifically,
Plaintiff was often observed wearing a t-shirt with Disney or
other cartoon characters and pants with colorful patterns.
8/24/10 Tr. 39:14-18 (Pacurucu); id. at 122:17-25 (Kawamoto);
8/26/10 Tr. 10:18-12:16 (Ibrahim); 9/1/10 Tr. 12:19-13:7 (Cruz).
At some time after the opening of the restaurant, Plaintiff was
given a chef jacket embroidered with the W Steakhouse logo and
his name.  8/24/10 Tr. 43:7-11 (Pacurucu); 8/26/10 Tr. 14:16-21
(Ibrahim testified that the uniforms were delivered the Wednesday
or Thursday after the opening weekend); 8/27/10 Tr. 138:2-9
(Shahata).  On several occasions, Plaintiff was spoken to by
Ibrahim about his attire.  8/26/10 Tr. 12:17-15:11 (Ibrahim); see
also Def's Ex. 139 (transcript of the Arabic portions of the
audio tape confirming the same).  Despite the numerous reprimands
regarding his attire and despite the fact he had been given a
chef jacket, Plaintiff continued wearing t-shirts and pants with
colorful patterns.[26/]  Moreover, it was important for Plaintiff to

---

   [26/] Plaintiff testified that he did not wear a chef coat on
certain days because he was told by W Steak that he would be
provided a uniform.  8/26/10 Tr. 147:22-24; 8/27/10 Tr. 142:7-9
(Shahata).  Although it is true that the uniforms did not arrive
until after opening night, Ibrahim testified that the proper
course of action for a management employee would be to purchase a
                                        (continued...)

dress in professional attire because patrons are permitted to go into the kitchen area and view the dry-aging process, making the Executive Chef highly visible to the patrons.  8/26/10 Tr. 11:17-24 (Ibrahim); 8/31/10 Tr. 86:25-87:2 (Cruz).

38.  In terms of his supervision of the kitchen employees, Plaintiff's shortcomings in that area are shown by Plaintiff's rehiring of (or the failure to fire) an employee who was working under the influence of alcohol.  8/26/10 Tr. 7:4-10:17 (Ibrahim); 9/1/10 Tr. 155:7-156:11 (Kawamoto).  Plaintiff, who was responsible for notifying the administrative offices of this individual's termination in the first instance, failed to do so.  9/1/10 Tr. 155:7-156:11 (Kawamoto).

39.  On Sunday, February 15, 2009, the kitchen at W Steakhouse Waikiki experienced what the witnesses agreed was a "meltdown."  This "meltdown" occurred during the time that Cruz left the restaurant for a brief period of time to freshen up.

---

26/(...continued)
chef's coat himself in the interim.  8/26/10 Tr. 13:25-15:11 (Ibrahim).  In addition, Plaintiff moved into evidence two photographs which depict him wearing the proper attire.  It was stipulated by the parties that the photos were taken on Saturday, February 21, 2009.  Defendant correctly notes, however, that this photo was taken after Plaintiff received his uniform, and only evidences his proper attire for the day the photo was taken.  See also 8/27/10 Tr. 32:19-33:1 (Ibrahim noted that he saw Plaintiff wearing a chef jacket only once).  The testimony of several witnesses confirmed that Plaintiff did not wear the proper attire at other times in the course of his employment with W Steak. 8/24/10 Tr. 39:14-18 (Pacurucu); 8/24/10 Tr. 122:17-25 (Kawamoto); 8/26/10 Tr. 10:18-12:16 (Ibrahim); 9/1/10 Tr. 12:19-13:7 (Cruz).

9/1/10 Tr. 32:12-21 (Cruz).  This "meltdown" occurred despite the fact that the restaurant was not very busy.  8/27/10 Tr. 29:9-30:9 (Ibrahim).  Specifically, the kitchen did approximately 178 covers[27] that night, whereas on a busy night, the kitchen does 350 covers.  Id.; see also 9/1/10 Tr. 67:22-24 (Cruz confirmed that it was not busy that night); 8/30/10 Tr. 16:14-17:2 (Shahata admitted that in his deposition he stated that on a typical night only six employees were needed to staff the line).[28]  In addition, the kitchen was initially fully staffed that night with seven (7) individuals, which is the number of staff present on what the restaurant considers to be a busy night, with one cook leaving at approximately 5 p.m.  Def's Ex. 144; 9/1/10 Tr. 121:9-124:15 (Choy); id. at 17:22-21:13 (Cruz testified that seven line cooks are needed for a busy night).[29]  In terms of what occurred,

---

[27] A "cover" is a customer seated at a table.

[28] During the days in which Plaintiff was employed as an Executive Chef with Defendant, W Steakhouse Waikiki only served dinner, as the lunch and brunch services were not provided until approximately two weeks after the restaurant opened.  8/26/10 Tr. 56:4-8 (Ibrahim).

[29] Plaintiff testified that the kitchen was understaffed on the day of the "meltdown," 8/26/10 Tr. 141:15-143:17 (Shahata), but this statement was contradicted by the testimony of Cruz and Choy, as well as the payroll records submitted into evidence.  See Def's Ex. 141; 9/1/10 Tr. 121:7-124:7 (Choy).  Moreover, Plaintiff testified that Donahue was injured on this night, contributing to the alleged staffing problems.  8/26/10 Tr. 141:15-143:17 (Shahata).  Donahue, however, testified that the injury only caused him to miss a few minutes of work.  9/2/10 Tr. 23:3-24:9 (Donahue); see also 8/27/10 Tr. 171:8-12 (Shahata (continued...)

34

the kitchen began to crash, meaning that because food was not being appropriately prepared on time, no food was leaving the kitchen and therefore patrons were not being served.  8/25/10 Tr. 79:13-80:7; 195:22-196:6 (Ibrahim).  The problem became so bad that Ibrahim and several members of the owner group went into the kitchen to find out what the problem was.  Id. at 80:1-7, 83:1-2 (Ibrahim observed Plaintiff chopping tomatoes at the salad station during this time period, instead of performing the expediting function).  Plaintiff was asked in frustration whether he wanted to be executive chef and was then instructed by one of the owners that he needed to expedite the food.  Id. at 201:1-13. Plaintiff then went to the expediting station in front of the line in the kitchen but shortly thereafter left that station. Id. at 196:12-20 (Ibrahim); 8/27/10 Tr. 174:11-19 (Shahata). Subsequently, Plaintiff was observed in the back of the line in the kitchen, ignoring the expediting function.  8/25/10 Tr. 196:12-20 (Ibrahim).  Cruz testified, and Plaintiff himself admitted, that, during this incident, Plaintiff totally melted down, looked frightened when the kitchen was crashing, and did not show any leadership at all.  9/1/10 Tr. 38:18-40:16 (Cruz); 8/31/10 Tr. 21:19-22:10 (Shahata).[30]

---

[29] (...continued)
admitted that Donahue continued to work that night).

[30] At trial, Plaintiff moved to subpoena tapes from the
(continued...)

Although Cruz oversaw Plaintiff when he was in the kitchen, Cruz was not present in the restaurant at the time the "meltdown," making Plaintiff in charge of the kitchen during that time period.  8/25/10 Tr. 81:1-10 (Ibrahim).[31/]

40.  At trial, there was testimony regarding an employee named Sal, who also performed the expediting function at times.  Sal was brought in from New York to train the front of the house staff.  8/25/10 Tr. 185:8-186:18 (Ibrahim).  It was intended that Sal would only be in Hawaii for a few weeks, similar to Cruz, until operations were running smoothly.  Id.

_____

[30/] (...continued)
video surveillance cameras located at W Steakhouse Waikiki, which allegedly would have recorded what took place on February 15, 2009 (it was unclear whether the cameras recorded sound as well). See 8/31/10 Tr. 36:23-41:5.  The Court, however, denied Plaintiff's motion to subpoena these video tapes, finding that Plaintiff had ample time to seek this evidence during discovery. In so doing, the Court observed that Plaintiff had made previous discovery requests before Judge Chang, which were denied, and that in those discovery requests Plaintiff did not seek the video surveillance tapes he sought to have subpoenaed at trial, even though he knew of their existence since the start of this litigation.  Judge Chang repeatedly informed Plaintiff as to how he should proceed under Fed. R. Civ. P. 34 to conduct discovery, but Plaintiff failed to follow Judge Chang's clear instructions. See Docs. No. 74, 120.

[31/] At trial, Plaintiff also seemed to suggest that Patrick, who was working as a line cook that evening, should have taken control of the kitchen.  Although Plaintiff is correct in noting that Patrick was qualified as an Executive Chef, Plaintiff was the Executive Chef in charge of the kitchen and thus was responsible for ensuring that the kitchen ran smoothly. Moreover, Defendant may have wanted to let Plaintiff take charge that night, to make sure he could perform adequately as the Executive Chef without anyone's supervision.

When the restaurant opened, Sal was performing the expediting function at times, while training or working as a food runner at other times.  8/24/10 Tr. 59:25-60:7 (Choy).  Although Sal may have assisted with expediting for the first few days, he was not expediting on the night of the "meltdown," and therefore it was ultimately Plaintiff's responsibly to expedite the food as he was in charge of the kitchen.  See 8/27/10 Tr. 44:21-45:22 (Ibrahim); 8/31/10 Tr. 115:13-126:4 (Cruz).  That is, although other employees sometimes performed the expediting function, it is ultimately the responsibility of the Executive Chef to make sure it is done properly.  8/31/10 Tr. 115:13-126:4 (Cruz).  As the current Executive Chef testified, expediting is ultimately the responsibility of the Executive Chef, and about 30% of the position is devoted to that function.  9/2/10 Tr. 31:15-22 (Donahue).

In addition, Plaintiff testified that the problems relating to expediting on February 15, 2009, were not his fault because an inexperienced food runner was expediting the food that evening.  8/26/10 Tr. 140:5-141:8 (Shahata); see also Def's Ex. 135 (referring to the fact that an inexperienced food runner was expediting food).  However, the testimony at trial showed that the food runner likely volunteered to expedite the food because Plaintiff failed to do so himself, therefore Plaintiff's placement of blame on the food runner is misplaced.  8/27/10 Tr.

37

37:3-21 (Ibrahim); 9/1/10 Tr. 114:16-115:12 (Cruz).

Moreover, Plaintiff also took issue with the beeper system, which was used by kitchen employees to contact waiters. The beeper system was placed on the back of the line for the first day or two of operations, and was then moved to the front of the line prior to February 15, 2009.  See Def's Exs. 116-18 (photos depicting the location of the beeper after it was moved to its current location); 9/1/10 Tr. 103:17-107:10 (Cruz). Plaintiff argued that, because of this, the Executive Chef would not be responsible for expediting, but this position was refuted by the testimony of Cruz and Donahue, which confirmed that the Executive Chef was responsible for ensuring that the food was expedited properly.  8/31/10 Tr. 115:13-126:4 (Cruz); 9/2/10 Tr. 31:15-22 (Donahue).[32/]

41.  Following the "meltdown," Darren Talai ("Talai"), who is part of WDI's management group, wrote an e-mail to Ibrahim and Taro Yoshida (who works for WDI) dated February 19, 2009 ("Talai e-mail").  In this e-mail, Talai noted, inter alia, the following concern:

**Sam** [referring to Plaintiff] - I have reserved

---

[32/] In fact, Plaintiff acknowledged that getting the food prepared on a timely basis was a responsibility of the Executive Chef, 8/30/10 Tr. 77:15-20 (Shahata), and as discussed supra this is part of the expediting function.  See also id. at 27:1-13 (Shahata admitted that at his deposition he stated that making sure all of the food for one table comes out timely and together was his responsibility as Executive Chef).

judgment on Sam thus far, however, my observation
of him over the past few days leaves me with
serious doubt on whether he can manage the
kitchen.  He does not look professional, his pants
look like pajama bottoms and he only wears a T
shirt, this is unacceptable for a fine dining
chef, he needs to wear black pants and a chef
jacket and look professional.  On Sunday [February
15, 2009], he totally melted down and literally
looked frightened when the kitchen was crashing,
he did not show any leadership at all, this is
totally unacceptable.  He has a blank look in his
face day and night.  The other problem is that he
talks too much about changing things, he needs to
follow our recipes and systems now, and he also
doesn't look like he wants to take responsibility
for anything.  **We need to make a decision on his
future by the end of the week!**

Def's Ex. 135 (emphasis in original).  When asked whether he

agreed with these observations of himself, Plaintiff said that he

did.  8/31/10 Tr. 21:19-22:10 (Shahata).  Cruz also agreed with

these observations.  9/1/10 Tr. 38:18-40:16 (Cruz).  The Talai e-

mail also discussed various other issues that arose throughout

the course of the opening weekend, including food being out of

stock, the changing of table numbers, and the importance of

maintaining appropriate staffing levels (though it is not clear

which days are being referred to, or whether Talai is referring

to the front of the house or the back of the house).  Def's Ex.

135.  Talai also made the following note about expediting:

**Expediting Food** - This was a complete disaster on
Sunday!  We're not sure how having a brand new
food runner expedite the food came to pass, but
obviously someone dropped the ball making this
decision.  We believe that Sam should have been
expediting the food under the watchful eye of
Amiro.  This is the heart of the operation, so we

cannot afford to have amateurs running the expo
line.

Id. (emphasis in original).

Finally, with regard to the table numbering, Talai

observed:

> **Table Numbers** - We have to quit changing the . . .
> Table Numbers!  I hope this was resolved at the
> end of the shift Sunday with Rex, Zio, Amir,
> Peter, and myself.  Please don't change them
> again!  Also, please pass out a copy of the new
> table number chart to each staff member and also
> post copies in the kitchen and each service
> station.

Id. (emphasis in original).  The Court finds, however, that while

the changing of the table numbers may have been one factor that

accounted for the problems on the day of the "meltdown," it does

not excuse Plaintiff's otherwise unsatisfactory performance on

that day.[33/]

42.  After February 15, 2009, Ibrahim told Plaintiff he

needed to "step it up" and take charge of the kitchen.  8/26/10

Tr. 19:23-20:2 (Ibrahim).  Plaintiff was put at various stations

on the line, including the broiler station, though he continued

to be the Executive Chef.  Id. at 19:17-22.  When placed at the

broiler position, he burned more than one steak.  Id. at 5:14-24;

8/25/10 Tr. 85:13-15 (Ibrahim recalled that Plaintiff burned two

---

[33/] The Talai e-mail also stated that food items had run out
of stock by 7 p.m. on one of the opening days, but the e-mail
does not indicate which day this occurred.  Def's Ex. 135.
Moreover, none of the testimony regarding the "meltdown"
suggested that food items ran out that evening.

40

steaks); 9/1/10 Tr. 63:3-11 (Cruz recalled one instance wherein Plaintiff burned a filet mignon).

43.   Based upon the foregoing shortcomings with Plaintiff's performance as Executive Chef, Cruz and Ibrahim determined that Plaintiff was not satisfactorily performing as Executive Chef and that he would be removed from that position. 8/24/10 Tr. 124:3-126:24 (Kawamoto); 8/26/10 Tr. 26:10-29:6 (Ibrahim); 9/1/10 Tr. 42:2-5 (Cruz).[34]   On February 22, 2009, Ibrahim and Cruz met with Plaintiff in a private dining room at the restaurant and informed him that he would no longer be the Executive Chef.   8/25/10 Tr. 75:16-25 (Ibrahim); 8/26/10 Tr.

_____

[34] As discussed infra, following a meeting on February 22, 2009, in which Ibrahim and Cruz informed Plaintiff that he could no longer be the Executive Chef, Plaintiff secretly recorded various conversations with W Steak employees between February 23, 2009, and February 27, 2009 (the day Plaintiff left Hawaii).  The recorded conversations, which are in both Arabic and English, were entered into evidence as Plaintiff's Exhibit 3.  In the Arabic portions of the tape recording, responding to Plaintiff's assertion that Patrick told him that he heard Plaintiff had quit, Ibrahim stated that he was the one that told Patrick to say that, "[s]o it doesn't . . . look like [W Steak] let [Plaintiff] go." Def's Ex. 140.  At trial, Ibrahim stated that he never told anybody that Plaintiff quit.  8/26/10 Tr. 31:7-33:22 (Ibrahim). Instead, he explained that this conversation was a follow-up from a previous conversation wherein Plaintiff told Ibrahim he was afraid he would lose credibility with other W Steakhouse Waikiki employees if he was removed from the Executive Chef position. Id.  In response, Ibrahim suggested that Plaintiff tell others that he quit the position as Executive Chef, instead of being removed, in order to save face amongst the other kitchen employees.   Id.  Although Ibrahim may have told others that Plaintiff quit, his reasons for doing so appear genuine (to make Plaintiff look better).  Moreover, whether or not Ibrahim told others that Plaintiff quit does not impact the ultimate decision in this matter.

26:10-29:6 (Ibrahim); 9/1/10 Tr. 42:2-5 (Cruz).  On the same
night, Ibrahim and Cruz offered Plaintiff a position as a line
cook (also referred to as a saute position at trial), which would
be paid at the highest hourly rate of any other hourly kitchen
staff employee, between $13 to $16.  8/26/10 Tr. 26:10-29:6
(Ibrahim); 9/1/10 Tr. 42:2-20 (Cruz).  In making the decision to
offer Plaintiff this position, Ibrahim and Cruz recognized that
Plaintiff was a hard worker and it was their intent, as they
conveyed to Plaintiff, that perhaps with time, after learning the
various stations and the restaurant's system, Plaintiff might be
able to become Executive Chef again.  8/25/10 Tr. 103:8-104:7
(Ibrahim); 9/1/10 Tr. 42:2-20 (Cruz).[35/]

        44.  In the line cook position, Plaintiff would have
received individual medical coverage and other employment
benefits.  See Pl's Ex. 3 (in the audio recording Kawamoto
explained to Plaintiff that he would receive certain medical
benefits as a line cook).  In the conversation with Ibrahim and
Cruz on February, 22, 2009, Plaintiff led Ibrahim and Cruz to
believe that he was accepting the line cook position.  8/25/10
Tr. 16:10-20 (Ibrahim testified that Plaintiff did not

--------

        [35/] In the audio recording, Cruz indicated to Plaintiff that
the line cook position was not a very "well-defined position,"
Pl's Ex. 3, but this is consistent with Ibrahim's and Cruz's
testimony that their intent was that perhaps with time, after
learning the various stations and the restaurant's system,
Plaintiff might be able to become Executive Chef again.

specifically state yes or no during that conversation, but the tone of the conversation led him to believe that Plaintiff would be assuming the hourly position); 9/1/10 Tr. 44:6-23 (Cruz).  As discussed <u>infra</u>, in subsequent conversations with Ibrahim and Cruz which are evidenced in the audio recording, Plaintiff made additional statements (such as telling Cruz that he would see him on Monday) that led Ibrahim and Cruz to believe that Plaintiff had accepted the line cook position.  <u>See</u> Pl's Ex. 3.  Plaintiff represented that he was also in the process of obtaining a position at the Sheraton Waikiki Hotel ("Sheraton").[36/]  Ibrahim told Plaintiff that he would work with Plaintiff's work schedule at the Sheraton, so that he could have two jobs.  <u>See</u> <u>id.</u>; Def's Ex. 139.  Notwithstanding, Plaintiff could work 40 hours per week or more in the line cook position depending upon his schedule with the Sheraton Waikiki Hotel.  Pl's Ex. 3; Def's Ex. 139.

45.  Subsequent to the February 22, 2009, conversation between Plaintiff, Ibrahim, and Cruz, Plaintiff began tape

---

[36/] At trial, however, Plaintiff testified that he never actually applied for a job at the Sheraton or went to the Sheraton to view their operations.  8/27/10 Tr. 189:24-191:14 (Shahata).  Instead, he asserted that he told Kawamoto and Ibrahim he was looking for a job at the Sheraton because he felt "pressured" by them.  8/31/10 Tr. 7:9-19 (Shahata).  Notably, however, Plaintiff also told Diego that he was looking for another job in Waikiki (where the Sheraton is located).  8/24/10 Tr. 39:19-24 (Pacurucu).  In any event, Ibrahim and Cruz were led to believe that Plaintiff was looking for a job at the Sheraton, as evidenced by the tape recording submitted by Plaintiff.  <u>See</u> Pl's Ex. 3.

recording some of his conversations with various representatives of W Steak without their knowledge in order to "protect his rights."  8/31/10 Tr. 45:25-46:10 (Shahata).[37]  Plaintiff did not, however, record all of his conversations with W Steak's representatives.  8/30/10 Tr. 68:1-6 (Shahata).[38]  At no time in any of the recorded conversations did Plaintiff in any way state that he could not be fired or removed from his position as Executive Chef because he had a one (1) year contract with W

---

[37] The tape recording, which is approximately one hundred (100) minutes in length, was submitted into evidence as Plaintiff's Exhibit 3.  The tape recording contains both English and Arabic portions.  Plaintiff submitted two proposed transcripts of the audio recording, and Defendant submitted one. In this case, Defendant's transcription and translation of the Arabic portions of the conversations were far more accurate and reliable, and thus were used in lieu of Plaintiff's proposed transcripts.  See 8/24/10 Tr. 2:13-3:15.  A written English translation of an audio recording in a foreign language, if admitted by the court, is itself evidence of the communications that occurred.  See United States v. Franco, 136 F.3d 622, 626 (9th Cir. 1998).  As such, the portions of the Arabic transcript that were entered into evidence, are themselves, evidence of the communications.  See Def's Ex. 139.  Furthermore, Defendant agreed that the transcription of the English portions of the audio recording in Plaintiff's second transcript was more accurate than Defendant's transcript.  As such, the Court referred to Plaintiff's second transcript for the portions of the audio recording that were in English, which were played in open Court in their entirety.  As these portions of the audio recording were in English, however, the Court only used the transcript to assist its understanding of the recorded conversations.  See Franco, 136 F.3d at 626.

[38] For instance, Kawamoto testified that she had one conversation with Plaintiff, which was not recorded, wherein Plaintiff told her that Ibrahim took Plaintiff into the meat locker, locked the door, and told Plaintiff that he was fired. 8/24/10 Tr. 10:15-11:5 (Kawamoto).

44

Steak.   See Pl's Ex. 3.   Instead, Plaintiff referenced the

Employee Handbook and asserted that W Steak was required to give

him written notice of any disciplinary problems.   See id.; see

also 8/27/10 Tr. 201:1-7 (Shahata admitted that he was referring

to the Employee Handbook in these recorded conversations).

Specifically, Plaintiff stated in the audio recording that "the

book [he took] . . . from [Kawamoto] which [she] gave it to

everybody, said at least [they] come in to give [Plaintiff]

notice for if [he] did something wrong."   Pl's Ex. 3.   He then

asserted that he "wasted his time" reading the Employee Handbook

since he was not given notice of what he did wrong.   Id.

        In a second recorded conversation between Kawamoto and

Plaintiff, after Kawamoto had spoken with Ibrahim about what

occurred on the night of February 22, 2009, Kawamoto stated that

"[i]f anybody does ask about you, please let them know that you

are no longer with the company."   Id.[39]   She also stated that

"Amiro [Cruz] should have come to [Plaintiff] and trained [him]

on certain things [such as expediting] . . . ."   Id.   Kawamoto

later explained, however, that Plaintiff was upset during this

conversation and that she was just trying to "defuse" the

_____

        [39] In her declaration, Kawamoto stated that "[i]t is [her]
understanding that Mr. Shahata voluntarily stopped working at W
Steakhouse Waikiki."   Pl's Ex. 8.   At trial, she explained that
"by saying that [he] . . . voluntarily gave up [his] job . . . is
because [he] never returned to work as a line cook, as was
offered to [him]."   8/24/10 Tr. 69:25-70:2; 8/25/10 Tr. 24:25-
25:17 (Kawamoto).

situation by appearing to agree with Plaintiff.  8/25/10 Tr. 19:16-20:3, 51:12-17; 9/1/10 Tr. 159:8-159:9 (Kawamoto).  In other words, Kawamoto stated that she was uncertain whether Plaintiff had accepted the line cook position at that point in time, and that she had no personal knowledge as to Plaintiff's training with Cruz.  See 8/25/10 Tr. 18:3-12, 51:12-17 (Kawamoto).  Moreover, Cruz testified that he trained Plaintiff on various aspects of Plaintiff's position while in Hawaii (including expediting), and that at no point did Plaintiff indicate to Cruz that he did not understand the expediting function.  9/1/10 Tr. 5:18-6:8, 30:14-31:7 (Cruz testified that he explained to Plaintiff how the expediting system works).

46.  In one of Ibrahim's conversations with Plaintiff subsequent to February 22, 2009, it was agreed that on Friday, February 27, 2009, Plaintiff would bring Ibrahim his schedule at the Sheraton Waikiki so that Ibrahim could assign Plaintiff shifts at W Steakhouse Waikiki for the times he was not scheduled to work at the Sheraton.  See Def's Ex. 139 (transcript of Arabic portions of audio recording); 8/26/10 Tr. 53:9-21 (Ibrahim).  It was understood by Ibrahim and Cruz, based upon Plaintiff's representations, that Plaintiff would begin working as a line cook on Monday, March 2, 2009.  8/26/10 Tr. 53:9-21, 90:7-13 (Ibrahim), 9/1/10 Tr. 44:17-23 (Cruz).  Indeed, in the tape recording Plaintiff told someone that he was "going to start

46

Monday." Pl's Ex. 3.  He also told Cruz that he would "see [him] Monday."  Id.  However, Plaintiff did not show up on Friday, February 27, 2009, to give Ibrahim his schedule at the Sheraton Waikiki.  8/26/10 Tr. 53:9-21 (Ibrahim).  That night, after the restaurant closed, Ibrahim called Plaintiff by telephone and left a message for him.  8/26/10 Tr. 53:19-23 (Ibrahim).  On or around February 28, 2009, Ibrahim attempted to reach Plaintiff by telephone but Plaintiff did not return his calls nor did Plaintiff return to work at W Steakhouse Waikiki.  8/26/10 Tr. 55:4-10 (Ibrahim).[40]

47.  Plaintiff did not give Ibrahim, Cruz or any management personnel of W Steak any notice that he was not going to continue with W Steakhouse Waikiki in the line cook position. 8/26/10 Tr. 54:11-13 (Ibrahim).  Plaintiff left Hawaii on February 27, 2009.  8/27/10 Tr. 187:16-18 (Shahata).

48.  Subsequently, by letter dated April 7, 2009, W Steak reiterated its offer of the full-time line cook position to Plaintiff.  Def's Ex. 102.  This letter was titled "Change in Position Offer."  Id.  Plaintiff never responded to the letter.

_____

[40] While Plaintiff disputes that such calls were made, citing his phone records, see Pl's Ex. 9 (Shahata's telephone records for the relevant time period do not indicate that he received a call from Ibrahim on either February 27 or 28, 2009), Plaintiff failed to establish that such calls would be reflected on his phone bill if they were received when his cellular phone was off.  Indeed, Plaintiff admitted that his phone was off during his travel after he left Hawaii on February 27, 2009. 8/27/10 Tr. 189:19-21 (Shahata).

8/25/10 Tr. 22:5-7 (Kawamoto).

49.   Plaintiff was paid for all the time that he worked at W Steakhouse Waikiki at the appropriate prorated rate of an annual base salary of $60,000.  8/25/10 Tr. 21:16-22 (Kawamoto).

50.   Plaintiff's credibility was impeached numerous times throughout trial.  Although the Court will not set forward the details of every inconsistent statement Plaintiff made, the Court shall set forth the following examples.[41/]

On his application for the Ford's Colony Country Club in Virginia, Plaintiff stated that he received a graduate degree while in Egypt, but this was not true.  See Def's Ex. 140 (Plaintiff's application to work at Ford's Colony Country Club); 8/26/10 Tr. 162:2-5 (Shahata acknowledged that a statement that he had attended graduate school would be a false statement).

Although Plaintiff had previously declared that he had twenty six (26) plus years of experience as an executive chef in fine dining, his testimony at trial regarding his employment background showed this to be a drastic overstatement of his qualifications.  See Def's Ex. 141 (Shahata's previous declaration filed in opposition to summary judgment stating he has twenty six plus years of experience as an executive chef in

---

[41/] At one point, Plaintiff suggested that he had difficulty recalling certain events because he was fasting for Ramadan. Plaintiff later confirmed, however, that he was able to proceed with his testimony.  See 8/30/10 Tr. 9:6-20 (Shahata).

48

fine dining); 8/27/10 Tr. 56:13-63:20 (Shahata agreeing that he does not have twenty six years of experience as an executive chef in fine dining).  Plaintiff unpersuasively tried to explain that this was a result of a typographical error, and that he meant to say he had twenty six years of experience in fine dining (and not necessarily as an executive chef), 8/27/10 Tr. 85:10-14 (Shahata), but this would not be supported by Plaintiff's testimony either.[42]

Plaintiff initially testified that he worked at Ford's Colony Country Club for over a year, 8/26/10 Tr. 172:18-173:2 (Shahata), but the earnings statements submitted by Defendant as impeachment evidence showed that Plaintiff's total employment with Ford's Colony Country Club was for approximately seven (7) weeks during which he made a total of $3,058.80, Def's Ex. 140.

Furthermore, Plaintiff testified that he did not hire or interview anyone to work at W Steakhouse Waikiki, including Donahue.  8/27/10 Tr. 111:22-112:17, 167:4-169:5 (Shahata). This, however, was contradicted by Plaintiff's previous declaration and deposition testimony, as well as by Donahue's testimony, as Donahue testified that he was interviewed and hired by Plaintiff.  9/2/10 Tr. 18:19-20:8 (Donahue).

Plaintiff also at one point testified that he was not

---

[42] For instance, Pronto Cena, where Diego and Plaintiff worked together, was not a fine dining restaurant.  8/24/10 Tr. 32:2-24 (Pacurucu).

involved in the scheduling of kitchen employees, but this was in direct conflict to Plaintiff's repeated statements during his deposition testimony that he was involved in the scheduling of kitchen employees.  8/30/10 Tr. 13:19-16:22 (Shahata); see also 8/31/10 Tr. 133:22-135:1 (Cruz testified that he left Plaintiff and Choy in charge of scheduling); 9/1/10 Tr. 125:2-20 (Choy testified that he did the schedule with Plaintiff).

Further, Plaintiff testified that three people were missing from the kitchen on the day of the "meltdown," 8/31/10 Tr. 30:4-8 (Shahata), but this testimony was contradicted by Cruz and Choy, as well as the payroll records for that day.  See Def's Ex. 144.

Finally, although Plaintiff raised the issue of his inability to understand English for the first time at trial, the Court finds that Plaintiff's understanding of the English language was adequate to allow him to understand the terms of the Employee Handbook and Employment Offer.  Notably, at his deposition, Plaintiff, for the most part, chose not to use an interpreter though he was afforded the opportunity to use one. 8/30/10 Tr. 11:7-13:13 (Shahata acknowledged that at his deposition he stated that he was "good with English").  Notably, Plaintiff also testified that he studied law in Egypt.  8/31/10 Tr. 43:4-15 (Shahata).

51.  In conclusion, the Court finds that Plaintiff was

made aware of his duties as Executive Chef, and that he did not

satisfactorily perform these duties during the course of his

employment at W Steakhouse Waikiki.

## CONCLUSIONS OF LAW

1.  Having evaluated the factual aspects of Plaintiff's

claims, this Court will now make its conclusions of law.[43]

---

[43] In his closing argument, Plaintiff referred to a claim
for breach of the implied covenant of good faith and fair
dealing. 9/2/10 Tr. 50:17-21.  In its 6/25/10 Order, however,
the Court noted that the only claims that remained for trial were
Plaintiff's claims for breach of contract and promissory
estoppel.  6/25/10 Order at 41.  Moreover, in its 6/25/10 Order,
the Court granted summary judgment in favor of Defendant as to
Plaintiff's claim for wrongful termination, finding that
"Plaintiff has not alleged that he was fired for engaging in any
conduct comparable to the conduct of the plaintiffs in Parnar and
Peterman, nor has he identified a public policy that would be
promoted by allowing him to maintain a wrongful discharge claim."
Id. at 35-37.  Thus, it appears that the bulk, if not all of,
Plaintiff's breach of the implied covenant of good faith and fair
dealing claim was disposed of by the Court's 6/25/10 Order.  See
Shen v. Biogen Idec Inc., 523 F. Supp. 2d 48, 51-52 (D. Mass.
2007) (noting that under Massachusetts law, to make out a claim
of bad faith termination, a plaintiff must show that defendant
either (1) intended to benefit financially at plaintiff's
expense; or (2) terminated plaintiff in violation of a clearly
established public policy).
     Even if Plaintiff's breach of the implied covenant of good
faith and fair dealing claim was not disposed of by the Court's
6/25/10 Order, any such claim would fail as the Hawaii Supreme
Court does not recognize a cause of action for bad-faith
termination of an at-will employment contract.  See Kosmin v.
Centex Homes, No. 07-00059 ACK-LEK, 2008 WL 896422, *8 (D. Haw.
Mar. 31, 2008) (citing Parnar v. Americana Hotels, Inc., 65 Haw.
370, 652 P.2d 625 (1982)).  In the alternative, even if Plaintiff
was employed pursuant to a one year fixed-term contract,
Defendant would be entitled to judgment in its favor as to this
claim because, as discussed infra, it has not deprived Plaintiff
of any benefit under the agreement because Plaintiff was removed
from the Executive Chef position for good cause (because
                                        (continued...)

I.        **Breach of Contract**

2.   The Court concludes in the alternative that even if it construes Plaintiff's employment agreement as a contract with a term of one year binding on both parties, there was good cause for Defendant to terminate the agreement for the Executive Chef position because of Plaintiff's inadequate performance as Executive Chef.  The Court concludes Plaintiff's employment agreement was an at-will agreement which either party could terminate with or without good cause.  The Court first will address its conclusion that the employment agreement was an at-will agreement.

A.   **At-Will Agreement**

3.   Plaintiff asserts that W Steak breached its employment contract with Plaintiff by failing to employ him as an Executive Chef with W Steakhouse Waikiki for a period of one (1) year.

4.   Employment contracts with no specified time period are said to be of infinite duration and such an employment contract is typically held to be terminable at the will of either party for any reason or no reason at all.  <u>Parnar v. Americana Hotels, Inc.</u>, 65 Haw. 370, 374, 652 P.2d 625, 627 (1982).  Absent

---

[43]/(...continued)
Plaintiff did not perform satisfactorily).  Moreover, there has been no evidence that Defendant breached the implied covenant of good faith and fair dealing.

a finding that the at-will nature of Plaintiff's employment
relationship was altered by W Steak, there was no requirement
that termination of his employment be for any reason or cause.

     5.   Plaintiff's breach of contract claim fails because
he has not established that the terms of the Employment Offer
guaranteed him employment for a one (1) year term, and therefore
was employed on an at-will basis.  Plaintiff contends that the
"Employment Offer and Contract" between the parties is an express
agreement which guarantees him employment for a one (1) year
period.  The language of the Employment Offer at issue here
provided that "[u]pon signature of this document, you Ismail
Shahata will be agreeing to a one (1) year commitment to W Steak
Waikiki, LLC and to the Honolulu location."  Where the terms of a
contract are definite and unambiguous, there is no room for
interpretation; however, if the language used in the contract
leaves some doubt as to the meaning or intention of the parties,
the court can apply rules of interpretation to determine the
intention of the parties.  Thomas v. Pankow Holdings, Inc., 2000
Haw. LEXIS 194, *20 (2000).  A term in a contract is ambiguous if
it is capable of being reasonably understood in more than one
way.  Maui Land & Pineapple Co., Inc. v. Dillingham Corp., 67
Haw. 4, 11, 674 P.2d 390, 395 (1984).  Here, the Court finds that
the language of the Employment Offer regarding the one-year term
is ambiguous.  See also 6/25/10 Order at 17 (finding that there

were genuine issues of material fact regarding whether the
contract was at will or for a one year term).

6.   Where a term(s) of a contract is ambiguous, in
order to determine the parties' intent, the court can consider
extrinsic evidence, including evidence of the surrounding
circumstances and the parties' subsequent conduct in construing
the contract. Stewart v. Brennan, 7 Haw. App. 136, 143, 748 P.2d
816, 821 (App. 1988) (citing In re Taxes, Aiea Dairy, Ltd., 46
Haw. 292, 306, 380 P.2d 156, 163 (1963)).

7.   Extrinsic evidence introduced at trial established
that the parties' intent under the terms of the Employment Offer
was not to employ Plaintiff for a period of one (1) year.
Specifically, the evidence established that the language
pertaining to the one (1) year term was included to ensure that
Plaintiff was committed to working at the Waikiki location for a
specific period of time given the significant financial outlay W
Steak was making in relocating Plaintiff to Hawaii.  This
provision conflicted with the Employee Handbook and the nature of
at-will employment, however, and thus was not an enforceable
provision.[44]

---

[44] W Steak asserts that the one-year commitment is a
unilateral obligation which applies only to Plaintiff.  This,
however, is contrary to the Employee Handbook and the nature of
at-will employment, which permits either party to terminate the
employment arrangement without cause at any time.  W Steak
explains, however, that the one-year commitment was included to
(continued...)

8.    Through its Employee Handbook, W Steak clearly and repeatedly notified its employees that their employment was on an at will basis.  Plaintiff received and read the Employee Handbook

────────────

44/(...continued)
account for the significant monies W Steak was expending on moving Plaintiff and his family members to Hawaii.  The approach W Steak should have taken, however, would have been for W Steak to prepare a separate relocation agreement that clearly stated that such an agreement was not modifying the at-will nature of the employment relationship.  That is, an employee may be employed on an at-will basis, but also have a separate one-year agreement related to moving expenses.  See Shen v. Biogen Idec Inc., 523 F. Supp. 2d 48, 51-52 (D. Mass. 2007) (noting that the employee was employed on an at will basis, but also that she was subject to a relocation agreement which stated that if the employer terminated her for cause or poor performance within a year, the employee would be required to repay the employer for their moving expenses); see also Trout v. FirstEnergy Generation Corp., 3:07CV00673, 2008 WL 4159702, *1-*6 (N.D. Ohio Aug. 6, 2008) (granting summary judgment on an employer's counterclaim seeking reimbursement for relocation expenses because the employer terminated the employee with cause pursuant a relocation agreement); Baker v. General Chemical Corp., 1998 U.S. App. LEXIS 16897, *3 (10th Cir. 1998) (unpublished table opinion) ("The consideration exchanged by the parties [with regard to relocation] does not include job security or [plaintiff's] assurance that [he] would not resign in less than a year and is, therefore, not an agreement for employment for one year and does not alter [defendant's] unfettered right to discharge at any time and without cause." (internal quotation omitted)); Bertrand v. Controlled Power Ltd. P'Ship, No. 1995CA00398, 1996 WL 752846, *2-*3 (Ohio App. 1996) ("We find the relocation policy to be a benefit tied to a specific number of years. Such a benefit does not create an employment agreement for that term.").  As a result, although the relocation agreement should have been separate from the employment offer, W Steak's intent to have the one-year provision relate only to moving expenses is reasonable. In this case, as discussed supra, the one year provision is unenforceable because it is contrary to the Employee Handbook and because neither Ibrahim nor Peter Zwiener had the authority to enter into a fixed-term contract with Plaintiff, nor did the parties construe it as anything but an at-will employment agreement.

prior to receiving or signing the Employment Offer, and thus was fully aware of the language in the Employee Handbook prior to signing the Employment Offer.

9.   The evidence also established that Plaintiff was told by Ibrahim on several occasions prior to arriving in Hawaii that there would be no job security in his employment with W Steak.

10.   Importantly, the audio recording introduced into evidence does not contain any statements by Plaintiff which pertained to the fact that he allegedly had a one (1) year contract with W Steak.  In other words, had Plaintiff believed that he was employed pursuant to a one (1) year fixed-term contract, he would have likely raised this issue in his numerous tape-recorded conversations with W Steak employees following his removal as Executive Chef.  This is especially so, as Plaintiff stated that the purpose of tape recording these conversations was to "protect his rights."  Indeed, Plaintiff referred to discrimination and his rights under the Employee Handbook, but never once stated that he had a one-year contract with W Steak. This serves as compelling evidence that Plaintiff himself did not construe the Employment Offer to guarantee him employment for a one (1) year term.  See Stewart, 7 Haw. App. at 143, 748 P.2d at 821.

11.   W Steak's Employee Handbook provides for at-will

employment with very limited instances as to how that at-will employment can be altered or employment for a specified period of time can be agreed to.  While Ibrahim testified that he had authority to sign the Employment Offer, 8/25/10 Tr. 59:3-4 (Ibrahim), he did not have actual or apparent authority to enter into a fixed-term agreement pursuant to the Employee Handbook.

12.  Actual authority exists if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent so to act.  Cho Mark Oriental Food v. K&K Int'l, 73 Haw. 509, 515, 836 P.2d 1057 (1992).  There is no evidence that Ibrahim had actual authority to enter into a binding agreement for a specified term of employment between W Steak and Plaintiff or one that would otherwise alter the at-will nature of Plaintiff's employment.

13.  Apparent authority arises when the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he was purported to have.  Cho, 73 Haw. at 516-17, 836 P.2d at 1063. The focus of apparent authority is dependent on representations from the principal to the third party.  Harris v. Adolph, 484 F. Supp. 372, 384 (D. Haw. 1980).  Where there are no representations between the principal and the third party, there can be no apparent authority.  Id.

14.  Here, the Employee Handbook clearly stated, under

the "Purpose of this Handbook" and the "At-Will Employment Status" sections, that the at-will employment status could only be modified by a writing signed by the Chief Executive Officer, President, or Chairman of W Steak Waikiki, LLC.  These sections further provided that no manager or other representative of W Steak, other than individuals in those limited positions, had authority to enter into any agreement for employment for any specified period of time or any agreement inconsistent with the at-will employment policy.  As noted supra, Plaintiff acknowledged that he received and read the Employee Handbook before the Employment Offer was received and executed.  As a result, through these provisions of the Employee Handbook, W Steak represented to Plaintiff that the President, Chief Executive Officer and/or Chairman of the Board had authority to enter into an agreement for a specified period of time and all other managers and representatives did not have such authority.

15.   While Ibrahim had the authority to offer Plaintiff the Executive Chef position at a salary of $60,000 per year with certain benefits and reimbursement of certain relocation expenses and to sign the Employment Offer so conveying those terms, Ibrahim did not have apparent authority to enter into a binding agreement for a specified term of employment with Plaintiff or to otherwise alter the at-will nature of Plaintiff's employment. See Cho Mark Oriental Food, 73 Haw. at 516-17, 836 P.2d at 1063.

58

Ibrahim's lack of authority to bind W Steak to an employment agreement for a specified period of time or to otherwise alter the at-will nature of Plaintiff's employment serves as additional evidence that the parties did not intend to enter into an agreement that altered the at-will nature of Plaintiff's employment.

Thus, while Ibrahim did not have the authority to enter into a fixed-term contract with Plaintiff, Ibrahim had the authority to bind Defendant to an at-will contract including all of the terms in the contract (salary, transportation, moving expenses), exclusive of the one-year commitment.[45/]

16.   Accordingly, the Court finds that the language in the Employment Offer regarding the one (1) year commitment did not alter the at-will nature of his employment with W Steak.

**B.   Fixed-Term Contract**

17.   In the alternative, even if the contract constituted an enforceable and binding employment agreement for a one year term, Plaintiff's claim for breach of contract would fail as this one year term of employment could be and was

_____

[45/] In fact, H.R.S. § 388-7 requires every employer to "[n]otify each employee in writing, at the time of hiring of the rate of pay, and of the day, hour, and place of payment . . . ." H.R.S. § 388-7.  Thus, Defendant was required to provide Plaintiff's salary to him in writing.

terminated by W Steak for good cause.[46/]

18.  To establish a breach of contract, a plaintiff must show that he has performed the contract or that during the term of the contract he was ready, willing, and able to perform. Low v. Honolulu Rapid Transit Co., 50 Haw. 582, 585, 445 P.2d 372, 376 (1968).  Thus, a party cannot recover for breach of contract if he fails to comply with the contract himself.  PR Pension Fund v. Nakada, 8 Haw. App. 480, 491, 809 P.2d 1139 (1991).  The Restatement (Second) Contracts § 237 provides that a material failure of an employee's performance, including defective performance, will operate as a non-occurrence of a

_____

[46/] Corpus Juris Secundum explains that "good cause" is decided on a case-by-case basis:

> Where good cause is required for the discharge of an employee, an employer is not justified in arbitrarily discharging the employee. Good cause exists only where a discharge is objectively reasonable.  Any act of the employee which tends to injure his or her employer's business, interests, or reputation justifies discharge.
> Where good cause is required for the discharge of an employee, an employer is not justified in arbitrarily discharging the employee. The determination of whether just cause exists is made on a case-by-case basis.  There is no precise definition of good cause.  The grounds constituting good cause need not be specified in the contract, and the fact that the contract authorizes the employer to terminate it for certain specified causes does not necessarily prevent the employer from discharging the employee for a legal cause not so specified.

CJS Employer § 70.

condition.  Thus, where an employee is unable to satisfactorily perform the job functions of a job pursuant to an employment contract, termination of the employee's employment is justified, and does not constitute a breach of contact on the part of the employer.  See Carper v. Dominion Bankshares Mortg. Corp., No. 88-0327, 1988 U.S. Dist. LEXIS 17995 (E.D. Va. 1988).  The Hawaii Supreme Court has cited the Restatement of Contracts with approval in employment cases.  See Gonsalves v. Nissan Motor Corp. in Haw., 100 Haw. 149, 164, 58 P.3d 1196, 1211 (2002); Ravelo v. County of Hawaii, 66 Haw. 194, 201, 658 P.2d 883, 885 (1983).

19.  The Court finds that Plaintiff did not satisfactorily perform as Executive Chef at W Steakhouse Waikiki. The mere fact that Plaintiff worked long hours, as did other employees working at W Steakhouse at that time, and was generally a hard working individual is insufficient to establish the fact that Plaintiff satisfactorily performed his job as Executive Chef.  In addition, the fact that Plaintiff was paid for the work that he did perform is not inconsistent with the finding that Plaintiff did not satisfactorily perform his job as Executive Chef, as Hawaii law requires that employees be paid for time worked with no exception to that statutory requirement for poor performance.  See H.R.S. 388.

20.  Plaintiff alleged several reasons (excuses) for

61

his unsatisfactory performance.  The Court finds that these reasons are either not credible (for example, Plaintiff's testimony regarding the staffing levels on February 15, 2009, was contradicted by both the written payroll records and the testimony of Cruz, Donahue, and Choy) or were examples of Plaintiff's failure to take charge of, and responsibility for, the kitchen (for example, Plaintiff while blaming a low-level, front of the house employee for the problems that occurred on February 15, 2009, Plaintiff admitted that he did nothing to address the problems that were occurring).

Although discussed in more detail <u>supra</u>, Plaintiff's failures included, <u>inter alia</u>,: (1) not ensuring that the food prepared and served met W Steakhouse standards, (2) not ensuring that the expediting function was performed properly, (3) not properly managing the kitchen, (4) having a blank look on his face and not taking responsibility for anything, (5) committing to certain things and not following through, (6) being unable to train the kitchen staff, (7) becoming overwhelmed during a peak service time, and (8) not performing his administrative duties properly.  In light of these inadequacies, the Court finds that Plaintiff did not perform satisfactorily as the Executive Chef. An employment contract may be terminated by the employer due to the employee's inability to perform.  <u>See e.g.,</u> <u>Mingo v. Delta</u> <u>Airlines</u>, No. C 97-1256, 1998 U.S. Dist. Lexis 6022 (N.D. Cal.

Apr. 28, 1998).

   21.  Because W Steak established that Plaintiff did not
satisfactorily perform the job functions of the Executive Chef
position for W Steakhouse Waikiki, W Steak was justified in
terminating Plaintiff's employment as Executive Chef and such
termination would not constitute a breach of contract even if the
contract constituted an employment agreement for a one (1) year
term.

   22.  Although the Employee Handbook had a provision
noting that W Steak may give written notice of disciplinary
problems, the Employee Handbook stated that W Steak could
terminate any employee without notice.  Specifically, the
Standards of Conduct section stated:

> Disciplinary action may include oral or written
> warnings, suspension, demotion, and probation,
> ineligibility for a promotion or salary increase,
> and/or involuntary termination.  W Steak Waikiki,
> LLC. addresses violations on an individual basis.
> Nothing in this Handbook should be construed as a
> promise of specific treatment in a given
> situation.  Although W Steak Waikiki, LLC. may
> choose to use progressive discipline under
> particular circumstances, no formal process of
> progressive discipline is required before W Steak
> Waikiki, LLC. may impose any form of discipline,
> including termination.

Def's Ex. 133 at 44.  In addition, the "Purpose of this Handbook"
section stated, that "[w]hile this handbook describes the polices
and procedures the Company may choose to follow with respect to
discipline, no formal disciplinary procedure, warnings or

progressive counseling is required before W Steak Waikiki, LLC. may impose any form of discipline, including termination." <u>Id.</u> at 5.   Moreover, the Court finds that Plaintiff was put on notice of his inadequate performance, as critical restaurant personal expressed their dissatisfaction with Plaintiff on February 15, 2009 (asking him whether he wanted to be the Executive Chef), and Ibrahim told Plaintiff to "step up" and take charge of the kitchen on February 16, 2009.   Despite these warnings, Plaintiff continued to perform inadequately as Executive Chef.

23.   Additionally, while the Court has found that Plaintiff's English was sufficient to allow him to read and understand the Employee Handbook and Employment Offer; to the extent he was unable to do so, this inability would constitute a failure to be qualified for and/or perform the duties of the Executive Chef position as he was instructed to use the Employee Handbook in managing the kitchen employees.   As a result, termination of Plaintiff's employment as Executive Chef by W Steak would not constitute a breach of the employment contract.

24.   Further, Cruz and Ibrahim reasonably understood from Plaintiff's recorded statements that Plaintiff had agreed to a modification of his employment to work as a line cook, with the prospect of being able to regain his position as Executive Chef.

**II.        Promissory Estoppel**

25.   Plaintiff's claim for promissory estoppel also

64

fails.  Under Hawaii law, a plaintiff must establish the following elements in order to establish a claim for promissory estoppel: (1) there must be a promise; (2) the promisor must, at the time he or she made the promise, foresee that the promisee would rely upon the promise (foreseeability); (3) the promisee does in fact rely upon the promisor's promise; and (4) enforcement of the promise is necessary to avoid injustice. Gonsalves v Nissan Motor Corporation in Hawai'i, Ltd., 100 Haw. 149, 58 P.3d 1196 (2002).[47]

        26.  In this case, enforcement of the promise would not be necessary to avoid injustice.  That is, W Steak clearly had good cause to terminate Plaintiff's employment as Executive Chef, such that enforcement of the promise is not necessary to avoid injustice.  Accordingly, because Plaintiff has failed to prove this element of his promissory estoppel claim, the Court need not address the remaining elements.

        27.  Moreover, Hawaii law has approved the longstanding principle that equitable remedies are only available when legal

_____

[47] Hawaii courts have considered promissory estoppel claims in the at-will employment context.  In Morishige v. Spencecliff Corporation, 720 F. Supp. 829, 835-36 (D. Haw. 1989), the Court rejected the argument that "the Hawaii Supreme Court has not recognized a cause of action based on promissory estoppel for continuing employment in an 'at-will' situation and therefore [Defendants were] entitled to judgment as a matter of law."  The Court noted that in Ravelo, "the Hawaii Supreme Court held that detrimental reliance on a promise of 'at will' employment is actionable.  Id. (citing Ravelo, 66 Haw. at 199-200, 658 P.2d at 887.

remedies are inadequate.  See Porter v. Hu, 116 Hawai'i 42, 55, 169 P.3d 994, 1007 (Haw. App. 2007); AAA Hawaii, LLC v. Hawaii Insurance Consultants, LTD, No. 08-00299 DAE-BMK, 2008 WL 4907976 (D. Haw. Nov. 12, 2008).  Accordingly, in the alternative, if Plaintiff was employed pursuant to a fixed-term one year contract, Plaintiff's promissory estoppel claim fails because of the existence of an adequate legal remedy (breach of contract).

III.     **Summary**

28.  The Court enters judgment in favor of W Steak on all remaining counts of the Complaint.

<u>DECISION</u>

In sum, throughout the course of these proceedings it has become evident that Plaintiff feels greatly wronged by W Steak's actions.  However, putting aside the issue of whether Plaintiff was employed at will or pursuant to a fixed-term contract, it is clear that W Steak was justified in removing Plaintiff from the Executive Chef position.  Although Plaintiff insists that he was not responsible for various problems identified by W Steak, this simply reaffirms the fact that Plaintiff did not want to take responsibility for any problems in the kitchen.  Moreover, there were duties clearly within the scope of the Executive Chef position (such as ensuring food quality, ensuring timely service, and training employees) which the evidence showed Plaintiff was not able to adequately perform.

As a result, W Steak had good cause to remove Plaintiff from the Executive Chef position.

In light of the foregoing findings of fact and conclusions of law, this Court (1) finds that Plaintiff has failed to prove his claims by a preponderance of the evidence, and (2) finds that Defendant W Steak is entitled to judgment on all counts.  Having made those findings, this Court concludes that Defendant's motion to dismiss is moot.

IT IS SO ORDERED.

Dated:  Honolulu, Hawai'i, September 24, 2010.



_____
Alan C. Kay
Sr. United States District Judge

Shahata v. W Steak Waikiki, Civ. No. 09-00231 ACK-KSC: Findings of Fact, Conclusions of Law, and Decision